[Nos. A111267, A112153. First Dist., Div. One. Jan. 29, 2008.]

CONRAD J. DELL'OCA et al., Plaintiffs and Appellants, v.
THE BANK OF NEW YORK TRUST COMPANY, N.A., Defendant and
Appellant.

## COUNSEL

Howard Rice Nemerovski Canady Falk & Rabkin, Ethan P. Schulman, Eric S. Pettit; Law Offices of George Donaldson and George Donaldson for Plaintiffs and Appellants.

Morgan, Lewis & Bockius, Vincent P. Finigan, Jr., Brett M. Schuman, Robert A. Bailey and Umung Varma for Defendant and Appellant.

## OPINION

**STEIN, J.**—Plaintiffs Conrad J. Dell'Oca et al. brought suit against a number of defendants, including The Bank of New York Trust Company, N.A. (BNY), seeking damages for investment losses. A jury returned a verdict in favor of plaintiffs against BNY on some, but not all, of their claims. The trial court granted a new trial unless plaintiffs consented to a substantial reduction in damages. Plaintiffs appeal from that order. Plaintiffs also appeal from an order denying their motion for partial judgment notwithstanding the verdict (JNOV), directed at the claims rejected by the jury. BNY appeals from an order denying its own motion for JNOV and also from an order awarding costs to plaintiffs. BNY also has filed a protective cross-appeal, raising issues that become relevant only if the order granting a new trial is reversed. We

affirm the order granting a new trial and both orders denying the parties' respective motions for partial JNOV and JNOV. We reverse the order awarding costs.

BACKGROUND

*The DFS Defendants and the Business Plan*

Robert E. Vener was the president, director and controlling shareholder of DynaCorp Financial Strategies, Inc. (DynaCorp), and the president, chief executive officer, chief financial officer and director of DFS Credit Corporation (DFSCC), a wholly owned subsidiary of DynaCorp. Beginning in 1994, these entities operated under a business plan designed to profit from buying and collecting on health care receivables. The business plan, described in private placement memoranda (PPM's), called for the creation of corporate trusts. DFSCC was the grantor and trustee of the trusts, and also their administrator.[1] DynaCorp was the beneficiary of the trusts. (In keeping with the practice of the parties, from time to time, Vener, DynaCorp, DFSCC and Trusts I, II and IV will be referred to collectively as the DFS defendants.)

The trusts were funded by money obtained from investors (sometimes referred to as the noteholders), who received promissory notes on their investments and who were promised a stated return of interest. The PPM's recited the administrator would use trust money to purchase selected "eligible" health care receivables at a discounted price, paying a portion of the purchase price when the trust took possession of a receivable and the remainder when the receivable was collected. One attribute generally required of an "eligible" receivable was that it be relatively young in that no more than 90 days had elapsed from its billing date. The sums collected above and beyond the purchase price of the receivables were to be used to cover expenses, pay the promised interest to the noteholders and compensate the administrator. The PPM's cautioned potential investors that the notes involved a high degree of risk and should be regarded as a speculative investment.

Ultimately, four trusts were created: Trust I, Trust II, Trust III and Trust IV. Trust III later was dissolved and is not directly involved in this appeal.[2] The trusts continued to operate, and to pay interest to the investors, until June

---

[1] DFSCC apparently assigned its administrative duties to DynaCorp, but nonetheless continued to perform those duties itself.

[2] The assets from Trust III apparently were deposited into Trust IV.

2000, when it was announced they would be unable to make the scheduled payments. At that time, the trusts, collectively, owed over $50 million to the noteholders. In the end, trust receivables were auctioned off for approximately $4.4 million, which, after expenses were deducted, left $1.5 million.

### The Plaintiffs and Their Claims Against the DFS Defendants

Plaintiff Conrad J. Dell'Oca, trustee of the Dell'Oca Family Trust, had purchased notes from Trusts I and IV. Plaintiffs James P. and Karen Brainerd, trustees of the James P. Brainerd and Karen M. Brainerd Revocable Trust, had purchased notes from Trust II. Plaintiffs, on behalf of themselves and other persons who had purchased or otherwise acquired and held notes from the trusts, brought suit against the DFS defendants, and others, to recover damages resulting from the collapse of the trusts and related relief. According to plaintiffs, the DFS defendants had engaged in what was in essence a "Ponzi" scheme, where later invested funds—particularly funds invested in Trust IV—were used to make the interest payments on earlier invested funds.

Plaintiffs claimed the DFS defendants devised various schemes that allowed them to conceal that investor funds were being used for an improper purpose. As relevant here, plaintiffs claimed the DFS defendants used over $4 million from Trust IV to purchase health care receivables from Trusts I and II, violating the requirement that receivables be purchased directly from health care providers. Plaintiffs claimed the receivables Trust IV purchased from Trusts I and II were old and uncollectible, effectively ensuring that noteholders investing in Trust IV would recover little, if anything, on their investments. Plaintiffs also claimed the DFS defendants improperly shifted funds between trusts by asserting the transfers of funds were "deposit error corrections" or "repayments of fees." As a result of these actions, the trusts improperly commingled funds, generated fees for the administrator based on unauthorized and improper purchases, and concealed from investors that the trusts were not generating income.

### BNY: The Indenture Trustee

BNY's role in all of this was to be the indenture trustee to Trusts I, II and IV, under separate indenture agreements for each trust. (Another entity, Rivkin Radler, had been indenture trustee to Trust III, but as noted earlier, Trust III was dissolved.) An indenture trustee is created to handle debt securities, for the purposes of providing limited protection to investors. (See 15 U.S.C. § 77bbb.) In their book, Corporate Trust Administration and

Management (5th ed. 1998), Robert I. Landau and John E. Krueger explain the basic form: "The *trust indenture* is a device by which a corporation . . . borrows money from the general public or large institutional investors to issue securities. . . . The indenture provides the terms and conditions on which credit is extended; restricts the activities of the issuing corporation . . . as long as the indenture securities are outstanding; sets forth remedies available to the security holders if there is a default in payment on the debt securities or in the terms of the indenture contract; and otherwise defines the rights, duties, and obligations of the obligor company . . . , the security holders, and the trustee or trustees named in the instrument. If the indenture obligations are to be secured, the indenture creates or pledges the security and explains the terms and conditions for dealing with the security." (*Id.* at p. 22.) As plaintiffs' witness explained, the indenture trustee monitors the provisions of the loan agreements. It authenticates documents, and holds collateral. If there is a default, the indenture trustee takes charge of the assets and takes such steps as are required or allowed by the indenture agreement.

It will be recalled each trust had its own trustee, DFSCC, and each also had an administrator whose obligation was to manage the trust assets in accordance with the trust documents. BNY's responsibilities, obligations and legal liability as indenture trustee are not to be confused with those of the trustee or the administrator. It generally is acknowledged that the indenture does not create a trust relationship in the customary sense. (Landau & Krueger, Corporate Trust Administration and Management, *supra*, at p. 23.) "An indenture trustee is not subject to the ordinary trustee's duty of undivided loyalty. Unlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement." (*Meckel v. Continental Resources Co.* (1985) 758 F.2d 811, 816.)[3]

The indenture agreements involved here are lengthy, detailed and complicated. The agreement for Trust I, for example, is comprised of 13 articles set forth over 84 single-spaced, typed pages, plus a 19-page "First Supplemental Indenture." The agreement for Trust IV is comprised of 13 articles set forth

---

[3] Landau and Krueger provide the following explanation of the contractual nature of an indenture:

"Even though it is similar to other legal relationships, the trust indenture is mainly a contract, and the courts have been in almost unanimous agreement in applying contractual principles to this relationship.

"The parties to the contract, or the indenture, are the obligor company . . . and the trustee, and only these parties execute the instrument. However, the participation of another party, or class of parties—the indenture security holders—is essential to make the contract operative.

over 79 single-spaced, typed pages. In brief, under the terms of the agreements, BNY held a security interest in the trust assets that enabled it to take possession of those assets in the event of a default. In addition, as plaintiffs put it, BNY held the "purse strings," meaning it had control over the funds. The indenture agreements specified how and when BNY could release funds. BNY also had the obligations of authenticating the notes issued to the investors, processing instructions for transfers of money, and serving as a repository for documents. Article 6 sets forth the bulk of BNY's obligations as indenture trustee, and also includes a number of provisions designed to limit or eliminate BNY's liability for investment decisions or for the ill-advised or wrongful conduct of the administrator. Among other provisions, Article 6 recites that the indenture trustee "undertakes to perform such duties and only such duties as are expressly set forth in this Indenture." (Art. 6, § 6.1(a)(1).) It allows BNY to "conclusively rely on the instructions provided by the Administrator . . . as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Indenture Trustee and substantially conforming to the requirements of this Indenture," but also provides that "in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Indenture Trustee, the Indenture Trustee shall be under a duty

---

Three separate sets of contractual rights and obligations are created by each indenture: those between the obligor and the trustee, those between the obligor and the indenture security holders, and those between the trustee and the indenture security holders.

". . . The indenture provisions that define the trustee's principal rights, duties, and obligations and its relationship with the obligor relate primarily to the security for the obligations issued or to be issued . . . .

"The obligations issued under the indenture are directly those of the security holders and not of the trustee and are looked to primarily to define the relationship between the obligor and the security holders. . . . [¶] . . . [¶]

"[Difficulties in finding all the essential elements of a true contractual relationship between the trustee and the security holders] have led many courts not only to construe indenture provisions as being strictly against the obligor but also to try to find some other legal theory or precedent with which to protect the interests of the security holders. Such decisions have contributed to much of the confusion in the law, particularly as it relates to the third set of contractual relationships—those between the [indenture] trustee and the security holders. The existence of a 'trust' is necessary to create and define the [indenture] trustee's interest in and relation to the security and the contract, but its relationship to the security and to the security holders is essentially contractual rather than fiduciary. The trust's principal function is to administer the contract in accordance with its terms. It has only the authority and powers granted by the indenture and is subject to all its restrictions and limitations. Except to the limited extent specified, the trustee has no right or authority to represent or act for the security holders or to substitute its judgment for theirs. The trustee should be held accountable for failing to carry out its duties properly, but there is no basis for holding, as some courts have tried to do, that the trustee owes to each holder duties or obligations not specifically spelled out in the contract or required of it by statute or regulation." (Landau & Krueger, Corporate Trust Administration and Management, *supra*, at pp. 27–30, fn. omitted.)

to examine the same to determine whether or not they conform to the form required by this Indenture." (Art. 6, § 6.1(a)(2).)[4]

*Plaintiffs' Theories Against BNY*

Plaintiffs' case was based in large part on Article 1, section 1.2 of the indenture agreements. Article 1 sets forth "provisions of general application." Section 1.2 provides, "Upon any application or request by Issuer to the Indenture Trustee to take any action under any provision of this Indenture, Issuer shall furnish to the Indenture Trustee at its corporate office an Officers' Certificate stating that all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been satisfied and an Opinion of Counsel stating that, in the opinion of such counsel, all such conditions precedent, if any, have been satisfied, except that in the case of any such application or request as to which the furnishing of such documents is specifically required by any provision of this Indenture relating to such particular application or request, no additional certificate or opinion need be furnished."[5] Plaintiffs contended section 1.2 prohibited BNY from releasing funds for any reason whatsoever unless the request for funds was accompanied by a satisfactory officers' certificate and opinion of counsel, and that BNY breached the indenture agreements by releasing funds without first receiving the required certificates and opinions. Plaintiffs also argued that had BNY properly performed its obligations as indenture trustee, it would have recognized the DFS defendants were taking actions inconsistent with the

---

[4] Article 6, section 6.1 of the indenture agreements, entitled "Certain Duties and Responsibilities," provides, in subdivision (a):

"Except during the continuance of an Event of Default:

"(1) the Indenture Trustee undertakes to perform such duties and only such duties as are expressly set forth in this Indenture, and no implied covenants or obligations whatsoever shall be read into this Indenture against the Indenture Trustee; and

"(2) the Indenture Trustee may, whether an Event of Default shall exist hereunder, conclusively rely on the instructions provided by the Administrator . . . as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Indenture Trustee and substantially conforming to the requirements of this Indenture; but in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Indenture Trustee, the Indenture Trustee shall be under a duty to examine the same to determine whether or not they conform to the form required by this Indenture."

[5] Section 1.2 of the indenture agreements, entitled "Compliance Certificates and Opinions," provides in full:

"Upon any application or request by Issuer to the Indenture Trustee to take any action under any provision of this Indenture, Issuer shall furnish to the Indenture Trustee at its corporate office an Officers' Certificate stating that all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been satisfied and an Opinion of Counsel stating that, in the opinion of such counsel, all such conditions precedent, if any, have been satisfied,

PPM's, would have concluded a default had occurred, and should and would have shut down trust operations. They took the position that, had BNY performed its contractual duties, the whole investment scheme would have collapsed on March 7, 1997, when $747,333.89 was transferred from Trust II to Trust I, purportedly to correct a "deposit error," or, at the latest, on June 23, 1998, when Trust IV purchased receivables from Trust II. Finally, in posttrial proceedings, plaintiffs claimed the improper transfers out of Trust IV were an "event of default." As BNY was prohibited from allowing any sales of notes, or "closures" after the occurrence of an event of default, plaintiffs argued BNY also breached by allowing closures after March 1997 or June 1998.

*The Litigation*

Ultimately, all defendants except BNY settled for $8.75 million. Plaintiffs had stated four causes of action against BNY: breach of the indenture contract, negligence, gross negligence, and aiding and abetting the DFS defendants' breach of fiduciary duties owed to the investors. After the parties presented their cases, but before jury deliberations began, the court granted a directed verdict to BNY on the aiding and abetting cause of action. The court also granted plaintiffs a partial directed verdict on their breach of contract cause of action, ruling plaintiffs were entitled to sue as third party beneficiaries on the indenture agreements between the DFS defendants and BNY. Plaintiffs dismissed their causes of action for negligence and gross negligence. All that remained was plaintiffs' cause of action for breach of the indenture agreements for Trusts I, II and IV.

Plaintiffs' theory, again, was that but for BNY's breach, no investor would have put money into the trusts after March 1997 or June 1998, depending on which date was determined to be the date the investment scheme should have

except that in the case of any such application or request as to which the furnishing of such documents is specifically required by any provision of this Indenture relating to such particular application or request, no additional certificate or opinion need be furnished.

"Every certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture shall include:

"(1) a statement that each individual signing such certificate or opinion has read such covenant or condition and the definitions herein relating thereto;

"(2) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion [are] based;

"(3) a statement that, in the opinion of each such individual, he or she has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

"(4) a statement as to whether, in the opinion of each such individual, such condition or covenant has been satisfied."

collapsed. Plaintiffs therefore made no attempt to prove any act or omission by BNY caused the trusts to collapse. They also made no attempt to show that any act or omission by BNY reduced the value of their investments. They did not seek a return of the funds BNY allegedly allowed the DFS defendants to misappropriate. Instead, they argued BNY's act or omissions *prevented* the trusts from collapsing, and sought damages representing the sums invested after those dates. In addition, plaintiffs contended that had investors learned at an early date that the business plan was failing, they would have withdrawn their funds before they were lost. Plaintiffs therefore also sought the amount representing the sum plaintiffs believed existing investments would have returned had the trusts been liquidated in a timely fashion after March 1997 or June 1998. Plaintiffs' expert, Thomas Randlett, testified that approximately $41.4 million had been invested after March 7, 1997. Mr. Randlett also stated his belief that, assuming the trusts had been liquidated in an orderly basis after March 7, 1997, investors would have received 36 cents on the dollar, or $3.6 million, on investments of $10 million. In his opinion, that investors were not aware of the failing business plan as of March 7, 1997, therefore caused them to lose the sum of those figures, which he calculated to be $45,083,022. Mr. Randlett stated that if damages were calculated using June 23, 1998, as the operative date, plaintiffs' damages were between $35 and $36 million, representing $30,730,500 that had been invested after June 23, 1998, plus 25 cents on the dollar on existing investments (as of June 23, 1998) of $20 million.

The jury returned a verdict finding BNY had not breached the indenture agreements as to either Trust I or Trust II, responding "no" to questions on a special verdict form asking if BNY had done something the indenture agreements for either trust prohibited it from doing or had failed to do something the indenture agreements required it to do. The jury found BNY had breached Trust IV's indenture agreement, also finding the breach involved gross negligence and had harmed plaintiffs. The jury assessed plaintiffs' damages at $15,788,750. The court later awarded plaintiffs prejudgment interest in the amount of $6,198,707.

Plaintiffs filed a motion for partial JNOV, which the court denied. The court also denied BNY's motion for JNOV. It granted BNY's motion for a new trial subject to the condition the motion would be denied if plaintiffs agreed to a reduction in damages from $15,788,750 to $3,051,552.70, plus prejudgment interest. The court, reasoning plaintiffs were the prevailing parties, also awarded them their costs. Plaintiffs did not agree to the reduction in damages, choosing instead to file this appeal.

## DISCUSSION

### PLAINTIFFS' APPEAL

## I.

## Jurisdiction to Rule on Motion for New Trial

On June 16, 2005, after the parties had filed their posttrial motions, the trial judge, Judge O'Malley Taylor, held a hearing for the purpose of scheduling the time for filing opposing documents and also for scheduling argument. The parties and Judge O'Malley Taylor understood the court's jurisdiction to rule on the motions would expire on July 19, 2005,[6] which, while ordinarily posing no difficulties, was a problem because both plaintiffs' attorney and Judge O'Malley Taylor were about take out-of-state vacations. Plaintiffs' attorney was to return on July 12, but Judge O'Malley Taylor apparently would still be on vacation on the 19th. Ultimately, the parties and Judge O'Malley Taylor worked out a procedure that would allow the parties to present their arguments to the judge and have her determine the merits of their motions. They agreed the parties would have all opposing and reply papers in the judge's hands early in the week of June 27. The judge would issue a tentative ruling on July 11, and the parties would then conduct a telephonic hearing on July 13. The parties and Judge O'Malley Taylor followed the agreed-upon procedure. Judge O'Malley Taylor then prepared an order and transmitted it, electronically, to the Marin County Superior Court in California. The presiding judge of the superior court's civil division, noting Judge O'Malley Taylor's absence from California rendered her unable to act, appointed Judge Vernon Smith to act in her stead. Judge Smith signed the order on Judge O'Malley Taylor's behalf, and the order was entered on July 15, 2005.

There is no suggestion plaintiffs or their attorney had any objection to the proceedings leading up to the entry of the order. To the contrary, plaintiffs' attorney specifically and expressly agreed to have Judge O'Malley Taylor hear argument on the motion telephonically. The record also is devoid of any suggestion plaintiffs sought relief in the trial court for what they now contend was an order improperly signed by Judge Smith. On appeal, however, plaintiffs contend neither Judge O'Malley Taylor nor Judge Smith had authority to order a new trial.

---

[6] Code of Civil Procedure section 660 provides that the power of the court to rule on a motion for new trial "shall expire" 60 days from and after the mailing of notice of entry of judgment by the clerk of the court or 60 days from and after service on the moving party by any party of written notice of entry of judgment, whichever is earlier, or if such notice has not been given, 60 days after the filing of the first notice of intention to move for a new trial.

Plaintiffs cite Code of Civil Procedure section 661, which provides, as relevant: "The motion for a new trial shall be heard and determined by the judge who presided at the trial; provided, however, that in case of the inability of such judge or if at the time noticed for hearing thereon he is absent from the county where the trial was had, the same shall be heard and determined by any other judge of the same court." Plaintiffs also cite Government Code section 69741.1: "A motion for new trial . . . may, with the written consent of all parties concerned, be heard at any place in the State of California by the judge who presided at the trial." Finally, they cite Code of Civil Procedure section 166, subdivision (b):[7] "A judge may, out of court, anywhere in the state, exercise all the powers and perform all the functions and duties conferred upon a judge as contradistinguished from the court, or that a judge may exercise or perform in chambers." In plaintiffs' view, read together, these statutes allowed Judge O'Malley Taylor to hear and determine the motion for a new trial only if she was physically present in Marin County, or if she was physically present in another county in California and the parties by written consent agreed the motion might be heard at that location. Plaintiffs contend that because Judge O'Malley Taylor was not physically present in California when she heard and decided the motions, she lacked jurisdiction to rule on the motions. Plaintiffs concede that Judge Smith, who was in Marin County, had the power to hear and decide the motion in Judge O'Malley Taylor's absence, but contend that by simply signing Judge O'Malley Taylor's order, Judge Smith failed to exercise that power so that the order signed by him is a nullity.

Plaintiffs do not dispute they agreed Judge O'Malley Taylor could hear argument on the motions when she was out of state. They contend, however, they did not thereby waive the right to argue the order is ineffective or void. Plaintiffs maintain the territorial limits of sections 166 and 661 are mandatory and jurisdictional, pointing out that parties cannot by private agreement confer jurisdiction on a court to hear a new trial motion. (See *Hagan Engineering, Inc. v. Mills* (2003) 115 Cal.App.4th 1004, 1008 [9 Cal.Rptr.3d 723] [subject matter jurisdiction cannot be conferred by consent, waiver or estoppel].) Plaintiffs also point out they did not participate in the decision to have Judge Smith sign the order.

Plaintiffs' argument confuses "territorial jurisdiction" and/or "subject matter jurisdiction," in the sense of fundamental jurisdiction over a cause, with a court's "jurisdiction" to take a particular action. It also confuses territorial jurisdiction with the court's power to hear and determine. The Marin County Superior Court had "territorial jurisdiction" over the posttrial motions irre-

---

[7] Further statutory references are to the Code of Civil Procedure.

spective of Judge O'Malley Taylor's location. Similarly, Judge O'Malley Taylor's presence in or absence from California had no effect on the Marin County Superior Court's subject matter jurisdiction over the cause. This is not a case, for example, such as *Ehrler v. Ehrler* (1981) 126 Cal.App.3d 147, 153 [178 Cal.Rptr. 642], which plaintiffs cite, where the order was entered after the expiration of the time during which the order could be entered, and the court therefore lost jurisdiction. (And see also *In re Marriage of Liu* (1987) 197 Cal.App.3d 143, 149–152 [242 Cal.Rptr. 649] [trial court lacked jurisdiction to decide motion for new trial when hearing held more than 60 days after filing of notice of intention to move for new trial—but leaving open the possibility an exception from the mandatory time limits might exist where the delay was caused by circumstances beyond the moving party's control].)

Judge O'Malley Taylor's absence from California may have rendered her physically unable to sign and file an order in the Marin County Superior Court, but it did not deprive her of the power to hear and determine the merits of the posttrial motions. A party, for example, would have no cause to complain if a court takes the moving or responding papers to some other state, and reads and contemplates them there before returning to California to issue an order. Indeed, at least at the appellate level, a justice is entitled to participate in a decision and even sign it while out of state, transmitting his or her signature by facsimile to the clerk for purposes of filing. (See *People v. Billa* (2003) 31 Cal.4th 1064, 1073, fn. 6 [6 Cal.Rptr.3d 425, 79 P.3d 542] (*Billa*).) Similarly, despite the language of section 661, there is no reason to complain that the court *hears*, rather than *reads,* the parties' arguments from some remote location. The parties certainly could waive their right to a hearing and, that being true, there can be no cause for complaint that the court, while allowing the parties to argue their positions orally, heard those arguments while out of state.

■ It is not significant that section 661 does not specifically contemplate the situation where the trial judge hears and determines a new trial motion but another judge signs the order. As discussed previously, the Marin County Superior Court had subject matter jurisdiction over the motions at the time the order was signed and entered, and the legally effective judicial act of filing the order took place in California. It has been held that "[t]he power of the trial court to grant a new trial may be exercised only by following the statutory procedure . . ." (*Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892, 899 [215 Cal.Rptr. 679, 701 P.2d 826]), and also that the requirements of section 661 are "mandatory" (*Francis v. Superior Court* (1935) 3 Cal.2d 19, 29 [43 P.2d 300] (*Francis*)). Nonetheless, even were we to read section 661 as limiting the class of persons entitled to sign an order granting a new trial, a

departure from the statutory procedure is not fatal. For example, section 661 requires the clerk to provide notice by mail of the time designated for oral argument, but the failure to provide written notice was not fatal when the date for argument was set in open court and was chosen to accommodate the responding party's attorney who, therefore, received actual notice of the date. (*McGarvey v. Southern Pacific Milling Co.* (1935) 5 Cal.App.2d 604, 606 [43 P.2d 354].) Section 661 also provides that where the motion is heard by a judge other than the trial judge, it "shall be argued orally or shall be submitted without oral argument, as the judge may direct, not later than ten (10) days before the expiration of the time within which the court has power to pass on the same." But that the motion is submitted late does not deprive the court of the power to rule on it when the ruling takes place within the 60-day jurisdictional time period. (*Pappadatos v. Superior Court* (1930) 209 Cal. 334, 336 [287 P. 342].)

*Francis, supra,* 3 Cal.2d 19, cited by plaintiffs in support of their claim that the provisions of section 661 are mandatory, was an appeal from a judgment finding three attorneys in contempt of court for their actions in connection with a motion for new trial. The trial judge, Judge Wilson, had been present and available to hear and decide the motion, but the parties' attorneys went to a different department and submitted the posttrial motion to a different judge, who granted it. (3 Cal.2d at pp. 21–23.) The Supreme Court affirmed the judgment of contempt. It held, "To have the motion for a new trial heard by a judge familiar with the facts and law of the case, rather than by one totally unfamiliar with such facts and who has made no special study of the law applicable to those facts, was the very essence of section 661 of the Code of Civil Procedure. Its requirements were therefore mandatory . . . . To leave it optional with litigants to observe or disregard its provisions would defeat the very purpose and object of its enactment. . . . It was, therefore, the duty of petitioners in making said motion for a new trial, after judgment had been rendered by Judge Wilson, to present the same to Judge Wilson." (*Id.* at p. 29.) Here, of course, the motion was heard by the judge who had heard and decided the case, even though the order was signed by a different judge. In any event, we do not read section 661 as limiting the jurisdiction of the trial courts to act, and we do not read *Francis,* or any other case, as limiting the power of the court and the parties to depart from the provisions of section 661 by agreement when the effect of an agreed-upon procedure preserves the essence of the statute.

Plaintiffs' position, therefore, can be reduced to the complaint that Judge Smith, who signed the order, was not the judge who had heard and determined the motion. The simple response to this position is that appointing

Judge Smith to sign for Judge O'Malley Taylor in her absence was a proper exercise of the presiding judge's authority. (Cal. Rules of Court, rule 10.603(c)(1)(E).)[8] If, for example, Judge O'Malley Taylor had heard the motion and had written the order but had become incapacitated before signing it, there is little question but that it properly might have been signed by some other judge.[9]

For all of the above reasons, we conclude the order conditionally granting a new trial is not subject to attack on the grounds of lack of jurisdiction.

## II.

## New Trial Order

Plaintiffs sought damages representing (1) the sums invested after the date plaintiffs believed the investment scheme would have collapsed but for BNY's breach of the indenture agreements, and (2) the return investors would have received on existing investments if the trusts had been liquidated in a timely fashion after that date. The jury awarded plaintiffs $15,788,750. In granting the motion for a new trial, the court explained, "After weighing the evidence and from the entire record, including reasonable inferences therefrom, the Court concludes that the jury clearly should have reached a different verdict. . . . It is too speculative for the trier of fact to conclude that no one would have invested in Trust IV if they had known that Trusts I and II were having financial difficulties." The court expressed the belief that a reasonable measure of damages would be the difference between the price Trust IV paid to purchase receivables from Trusts I and II and the fair market value of those receivables, which it found to be $3,051,552.70. The court therefore made its grant of the motion for new trial conditional, ruling it would be denied if plaintiffs consented to a reduction in damages from $15,788,750 to $3,051,552.70. Plaintiffs claim error.

---

[8] California Rules of Court, rule 10.603(c) sets forth the duties of the presiding judge, which include the duty to "[d]esignate a judge to act if by law or the rules of court a matter is required to be presented to or heard by a particular judge and that judge is absent, deceased, or unable to act." (Cal. Rules of Court, rule 10.603(c)(1)(E).)

[9] A somewhat similar situation occurred in *Theriot v. Superior Court* (1963) 221 Cal.App.2d 174 [34 Cal.Rptr. 381]. The trial court judge in that case issued an order conditionally granting a new trial, and then left the state to go on vacation. The parties discovered they disagreed on the meaning of the order and went to the presiding judge. The presiding judge spoke with the trial judge, who was still out of state, and then, with the trial judge's agreement, corrected the new trial order, nunc pro tunc. (*Id.* at p. 178.) The reviewing court rejected an argument that the order was void because it was issued by a judge who was outside of California, finding the order was in fact made by the presiding judge, who was in California. (*Id.* at p. 180; and see *Billa, supra,* 31 Cal.4th at p. 1073, fn. 6 ["So long as the clerk is authorized by the court to file the opinion or order, and the filing occurs in California, the legally effective judicial act is performed in California."].)

As a general rule, when a motion for new trial is granted on the ground of excessive damages, or where the trial court requires a reduction in the amount of damages as a condition of denying the motion, the order will not be reversed unless it plainly appears the court has abused its discretion, " 'and the cases teach that when there is a material conflict of evidence regarding the extent of damage the imputation of such abuse is repelled, the same as if the ground of the order were insufficiency of the evidence to justify the verdict.' [Citations.] The reason for this is that the trial court, in ruling on the motion, sits not in an appellate capacity but as an independent trier of fact. Thus, . . . section 662.5 of the Code of Civil Procedure, dealing with orders for a new trial conditioned on additur or remittitur, indicates that such orders shall be made unless the affected party consents to the addition or reduction 'of so much [of the verdict] as the court *in its independent judgment determines from the evidence to be fair and reasonable.*' " (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 933 [148 Cal.Rptr. 389, 582 P.2d 980], italics added by *Neal*.) "While the reviewing court must consider only those reasons for granting the motion stated by the trial court in its order, within those confines the question on appeal from an order conditionally granting a new trial on the basis of excessiveness of damages is simply 'whether a verdict for an amount considerably less than that awarded [by the jury] would have had reasonable and substantial support in the evidence.' [Citation.]" (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 379 [33 Cal.Rptr.3d 644].)

It is of no matter that the court, in granting the motion for new trial unless plaintiffs consented to a reduction in the damages award, employed a theory for measuring damages that had not been asserted at trial.[10] Plaintiffs did not accept the remittitur, effectively rendering moot any complaint about the court's reasoning.[11]

---

[10] As the court explained, "Although plaintiffs' expert . . . did not testify as to the fair market value of the specific receivables wrongfully purchased from Trusts I and II by Trust IV, he did testify as to the liquidation value (sales value of the receivables if the business were liquidated) as of 3/07/97 and 6/23/98. He testified that the liquidation value of the trusts as of 6/23/98 was approximately 25%. This estimate is supported by sufficient details about the methodology of his calculations, both in his deposition and his trial testimony, and so there was no surprise or irregularity in the trial testimony on this issue. Based on this evidence, the Court determines, in its independent judgment, that the fair and reasonable amount of damages is $3,051,552.70 ($4,068,736.93 [the amount Trust IV paid for the receivables it purchased from Trusts I and II] x 75%)."

[11] It also is true that by appealing the new trial order, plaintiffs may not now avoid a new trial by accepting the remittitur. (See *Swett v. Gray* (1903) 141 Cal. 63, 70 [74 P. 439] [by appealing, a plaintiff effectively refuses to remit any portion of the judgment and should not be permitted to take the benefits of the conditional new trial order if the appellate court rejects its appellate arguments].)

■ Plaintiffs contend, however, that the ordinary standard of review for orders on a motion for new trial does not apply. According to them, although the order was styled an order for a new trial, its true nature was that of a partial JNOV, so that in reviewing the order this court " ' "must resolve any conflict in the evidence and draw all reasonable inferences therefrom in favor of the jury's verdict. [Citation.]" ' [Citation.]" (*Hansen v. Sunnyside Products, Inc.* (1997) 55 Cal.App.4th 1497, 1510 [65 Cal.Rptr.2d 266].) An appellate court has the power to look at the substance of a new trial ruling, and where the effect of the ruling is closer to a directed verdict or a JNOV, the ruling may be deemed to have been based on a conclusion of law so that de novo review is appropriate. (*In re Coordinated Latex Glove Litigation* (2002) 99 Cal.App.4th 594, 614 [121 Cal.Rptr.2d 301]; *Fountain Valley Chateau Blanc Homeowner's Assn. v. Department of Veterans Affairs* (1998) 67 Cal.App.4th 743, 752–753 [79 Cal.Rptr.2d 248] (*Fountain Valley*).) The order at issue here was not in the nature of a directed verdict or a JNOV. The distinction is that one kind of ruling—such as nonsuit, directed verdict or JNOV—disposes of the litigation. In granting the motion the court essentially rules the plaintiff never can prevail, even if the matter were to be retried. (*Id.* at p. 751.) It follows, in part, that a court should make such rulings only when, disregarding conflicting evidence, giving to the plaintiff's evidence all the value to which it is legally entitled and indulging in every legitimate inference which may be drawn from that evidence, the result is a determination there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff. (*Hansen v. Sunnyside Products, Inc., supra*, at p. 1510.) On the other hand, a grant of a new trial on the grounds of insufficiency of evidence "does not entail a victory for one side or the other. It simply means the reenactment of a *process* which may eventually yield a winner." (*Fountain Valley, supra*, at p. 751.) The motion is granted "*not* because the judge has concluded that the plaintiff *must* lose, but only because the evidence in the trial that actually took place did not justify the verdict. Evidence might exist to justify the verdict, but for some reason did not get admitted; perhaps [because] the plaintiff's attorney neglected to call a crucial witness or ask the right questions. *There is still the real possibility that the plaintiff has a meritorious case.*" (*Id.* at p. 752, fn. omitted.)[12]

---

[12] In *Fountain Valley,* for example, where the appellate court reasoned that an order granting a new trial was in substance a JNOV, the trial court explained that it believed the defendant's actions had been totally reasonable, stating on the record that the plaintiff never could prevail given the reasonableness of the defendant's position. (*Fountain Valley, supra,* 67 Cal.App.4th at pp. 749, 752–753.) The trial court also pointed to no problem in the process of the trial that warranted a retrial. (*Id.* at p. 753.) The appellate court reviewed the trial court's ruling as a JNOV in substance, if not in form, finding, "[t]he bottom line is that the judge might as well have said the association acted reasonably *as a matter of law* and given judgment for the defendant there and then." (*Ibid.*)

Here, the order granting a new trial did not dispose of the litigation. It was not based on a finding that BNY had an absolute defense or that plaintiffs never could produce evidence of damages on the theory they asserted. The court ruled only that the evidence plaintiffs *had* produced on that theory was too speculative to permit recovery. The court also may have believed the jury was persuaded by evidence it should not have considered, noting it had sustained objections to questions to plaintiffs' expert witness that might have provided a basis for the jury's award. By granting the motion for new trial, the court gave plaintiffs the opportunity to try again, presumably recognizing they might be able to produce evidence to support their theory.

■ Plaintiffs also argue reversal is required even if the trial court's ruling is reviewed under an abuse of discretion standard. They assert that although the court characterized the ground for its order as excessive damages, it actually granted a new trial because it found insufficient evidence to support plaintiffs' theory of causation. Section 657 recites an order granting a new trial "shall not be granted upon the ground of insufficiency of the evidence to justify the verdict . . . [¶] . . . [¶] . . . or upon the ground of excessive or inadequate damages, unless such ground is stated in the order granting the motion . . . ." In plaintiffs' opinion, the court's failure to state the true ground for its ruling—insufficiency of evidence to prove causation—means this court cannot affirm the order. We disagree. The court's explanation of its ruling: "It is too speculative for the trier of fact to conclude that no one would have invested in Trust IV if they had known that Trusts I and II were having financial difficulties," provided adequate notice to the parties and to this court that the trial court found the evidence did not support plaintiffs' theory of damages. It is not fatal that the court did not characterize its ruling as a finding of lack of causation of the damages sought by plaintiffs. In any event, the court concluded there was evidence BNY's breach of the indenture contract caused injury to plaintiffs, and thus that BNY's breach actually caused damages, to the extent plaintiffs were able to prove them. ■ Second, any time a new trial is granted for excessive damages, the court in effect is finding the evidence to have been insufficient to support the jury's award. In other words, an order granting a new trial on the grounds of excessiveness of damages automatically covers that aspect of the sufficiency of the evidence. Neither section 657 nor reason requires a court granting a new trial on the grounds of excessive damages to add that it finds the award to be excessive because the evidence is insufficient to support the award. (And see *Kent v. Los Angeles Ry. Corp.* (1938) 29 Cal.App.2d 435, 436–437 [84 P.2d 1057] [recognizing that an order granting a new trial for excessive damages " ' "implies that the motion was granted upon a consideration of the insufficiency of the evidence to support the verdict" ' "].)

Plaintiffs cite *Shawmut Bank, N.A. v. Kress Associates* (9th Cir. 1994) 33 F.3d 1477 (*Shawmut*), a case with some factual similarities to the present case, but also with differences that illustrate the flaws in plaintiffs' position. The plaintiffs in *Shawmut* were bondholders who had purchased industrial development bonds issued to finance a real estate development project. The project collapsed, in part because one of the principals of the developer had diverted most of the bond proceeds to other companies he controlled. The plaintiffs brought suit against various entities, including First Interstate Bank of California (FICAL), the indenture trustee. (*Id.* at pp. 1481–1484.) As relevant, the indenture contract provided FICAL would release funds pursuant to requisitions for disbursement that specified in "reasonable detail" the purpose for which the funds could be used. FICAL breached the indenture agreement by releasing funds in response to requisitions that did not have adequate detail. (*Id.* at p. 1493.) The plaintiffs sought damages based on the funds lost when the developer used them for an improper purpose.

FICAL claimed the plaintiffs engaged in speculation by asserting their loss was caused by its breach of the indenture agreement. Its theory was that had it refused to disburse the funds because of the lack of detail in the requisitions, the developer simply would have supplied the necessary details. FICAL pointed out it was entitled to rely on the face of the documents, reasoning that once the developer supplied the details, it would have released the funds and the bondholders still would have suffered injury. (*Shawmut, supra*, 33 F.3d at p. 1496.) The trial court agreed, and finding the plaintiffs had failed to come forward with any evidence that would establish their losses were proximately caused by FICAL's breach, granted summary judgment to FICAL. (*Id.* at p. 1494.) The appellate court reversed. It recognized the plaintiffs' theory of causation was speculative as it depended on what the developer would or would not have done had the indenture trustee refused to disburse the funds. But FICAL's theory—that the developer simply would have supplied the missing details—also depended on what the developer would or would not have done, and therefore was similarly speculative. The court held that summary judgment was improper as "[c]hoosing between the speculations is ordinarily a question for the trier of fact, who must 'determine the balance of probabilities.' [Citation.]" (*Id.* at p. 1496.)

There are several reasons why *Shawmut, supra*, 33 F.3d 1477, does not support plaintiffs' argument here. First, while the trial court in *Shawmut* believed the plaintiffs could not prove FICAL's breach was a cause of their loss, the trial court here reasoned that the evidence *did* support a finding that BNY's breach resulted in loss to plaintiffs; it just found plaintiffs' theory of damages to be speculative based on the evidence properly admitted at trial.

The trial court here essentially recognized plaintiffs might be entitled to damages on the same theory of loss claimed by the *Shawmut* plaintiffs: the funds lost when the indenture trustee improperly released them. Second, *Shawmut* was an appeal from a grant of summary judgment that had disposed of the litigation. It follows that reversal was required if there was some possibility the plaintiffs could prove their theory. Here, again, the order granting a new trial did not dispose of the litigation, and the trial court's ruling must be upheld if its decision finds support in the record.[13]

But there is an additional, important, reason for distinguishing *Shawmut*. The plaintiffs there sought damages based on the sums that had been improperly released to the developer. In reversing the summary judgment, the appellate court reasoned it was quite simple, as an initial matter, to determine whether or not the breach was a cause of the plaintiffs' loss—because of the breach, the money was given to the developer who used it for his own purposes. (*Shawmut, supra*, 33 F.3d at pp. 1496–1497.) It followed it was the indenture trustee that was engaging in speculation by imagining what would have happened in the absence of breach, asserting that if the indenture trustee had refused to disburse the funds without adequately detailed requisitions, the developer simply would have amended the requisitions. (*Id.* at p. 1496.) Here, it is *plaintiffs* who are imagining what would have happened in the absence of breach (i.e., that the investment scheme would have collapsed so that no additional funds would have been invested and less money would have been lost on existing investments), and, as the court in *Shawmut* recognized, the party that imagines what might have happened in the absence of breach is the party that engages in speculation. (*Ibid.*)

---

[13] Other cases cited by plaintiffs are distinguishable for similar reasons. In *Better Foods Mkts. v. Amer. Dist. Teleg. Co.* (1953) 40 Cal.2d 179 [253 P.2d 10], the plaintiff brought suit against a defendant burglar alarm company for losses sustained in a burglary, alleging the defendant had failed properly to transmit burglar alarm signals to their own guards and to the police. (*Id.* at p. 182.) After the jury was unable to agree and was dismissed, the trial court entered judgment for the defendant, reasoning that a motion for directed verdict should have been, but was not, granted. (*Ibid.*) The judgment, of course, disposed of the litigation. The Supreme Court therefore viewed the evidence in the light most favorable to the plaintiff, finding a directed verdict should not have been granted because some evidence supported the plaintiff's theory of causation. (*Id.* at pp. 182–183.) The court also pointed out the difficulty of ascertaining what portion of any loss suffered should be attributed to the defendant's failure to perform (*id.* at p. 186)—a point that favors BNY's position here. In *Helm v. K.O.G. Alarm Co.* (1992) 4 Cal.App.4th 194 [5 Cal.Rptr.2d 615], the plaintiffs brought suit against an alarm company after their mobilehome was burglarized and set on fire. (*Id.* at pp. 199–200.) Although the appellate court ultimately affirmed a judgment of nonsuit for lack of evidence supporting the plaintiffs' theory of liability (*id.* at p. 204), it held the trial court erred when it found the plaintiffs were precluded as a matter of law from attempting to prove a causal nexus between the defendant's conduct and the plaintiffs' loss. (*Id.* at pp. 202–203.) The trial court here did not rule that plaintiffs were precluded as a matter of law from attempting to prove a causal nexus between BNY's conduct and their loss; it found only that plaintiffs had failed to prove the full extent of the loss they claimed.

Plaintiffs seize on an additional point made by the trial court in conditionally granting a new trial. The court noted, "Plaintiffs' expert testified that the DFS Trusts failed because of the failure of the business model, i.e., 'the DFS Trusts failed because they were unable to collect the receivables in a timely enough fashion to meet interest obligations.' " Plaintiffs complain that the court's reference to this testimony reflected a misunderstanding of the law, asserting that the court found their loss to be speculative because it wrongly assumed they were required to show BNY's breach was the *only* cause of their loss, when they needed to show only that it was more than a remote or trivial factor that contributed to the harm.[14] The flaw in this line of reasoning is that it confuses the cause of the trusts' failure with plaintiffs' theory BNY's breach caused their loss by *delaying* the date of default. Plaintiffs complain the court erroneously concluded the evidence BNY caused the default was speculative, when the court's ruling actually was based on the speculative nature of the evidence BNY's breach *delayed* the default, and the speculative nature of plaintiffs' claims about what they, or a reasonable investor, would have done had there been no breach.

■ Having rejected plaintiffs' claim that the order granting a new trial was in reality a partial JNOV, and finding support for the order in the record, we will not address plaintiffs' many arguments that the evidence supports the jury's verdict or that the trial court should have weighed the evidence differently. The trial court, which heard the evidence, and was in a position to assess the credibility of plaintiffs' witnesses, was entitled to conclude the jury's award was based on speculation; i.e., that but for the breach, Trusts I and II would not have obtained the funds to pay interest to the investors; that when interest was not paid, Trusts I and II would have gone into default; that once those trusts went into default potential investors would have become aware of the flaws in the entire business plan and would not have invested additional money in Trust IV and would have withdrawn the funds they had invested, and that they would, instead, have chosen to invest their money in some other venture where their funds would have been preserved.

### III.

### Plaintiffs' Motion for Partial JNOV

Plaintiffs moved for partial JNOV, asking the court to reverse the jury's finding BNY had complied with Trust I's and II's indenture contracts. The

[14] But see *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1049 [1 Cal.Rptr.2d 913, 819 P.2d 872], cited by the court in *Shawmut, supra,* 33 F.3d at page 1495: " 'There are two widely recognized tests for establishing cause in fact. The "but for" or "sine qua non" rule . . . asks whether the injury would not have occurred but for the defendant's conduct. The other test, labeled "legal cause" . . . , asks whether the defendant's conduct was a *substantial* factor in bringing about the injury.' [Citation.]" (Italics added.)

court denied plaintiffs' motion, finding a partial JNOV would be available only if it could be coupled with the remainder of the unaltered verdict to become a final judgment. (Citing *Beavers v. Allstate Ins. Co.* (1990) 225 Cal.App.3d 310, 330 [274 Cal.Rptr. 766] (*Beavers*).) Plaintiffs contend that, contrary to the trial court's understanding of the law, the court had the power to grant plaintiffs' motion for partial JNOV.

■ It is settled that the trial court has the power, in appropriate circumstances, to grant partial JNOV. In *Beavers, supra,* 225 Cal.App.3d 310, after the jury entered a verdict awarding compensatory and punitive damages to the plaintiffs, the trial court granted JNOV as to punitive damages and some of the causes of action, and granted a new trial as to all remaining issues. (*Id.* at p. 314.) The Court of Appeal agreed the trial court had the power to grant partial JNOV as to some but not all issues or causes of action, reasoning in part that such a conclusion is consistent with law equating a trial court's power to grant JNOV with its power to grant a motion for a nonsuit or a directed verdict. (*Id.* at pp. 327–329.) The court recognized a procedural difficulty exists where the trial court grants a partial JNOV and a partial new trial and an appeal is taken from the new trial order. The JNOV essentially asks the trial court to vacate the judgment entered on the verdict and enter a new judgment despite the verdict, but a partial new trial order vacates and holds in abeyance the entire judgment. (*Id.* at p. 330.) The court found these difficulties could be resolved by making the entire judgment, including the portion affected by the partial JNOV, subject to appellate review. (*Id.* at pp. 329–330.)

The present situation is not quite the same as that in *Beavers, supra,* 225 Cal.App.3d 310, because the partial JNOV in that case, entered in favor of the *defendant,* completely disposed of several of the plaintiffs' causes of action, which then could be reviewed by the appellate court. Here, had the court granted plaintiffs' motion, it would have ruled only that plaintiffs had established BNY failed to comply with Trust I's and Trust II's indenture contracts. That ruling would not have disposed of any cause of action because several issues remained as to liability,[15] and the ruling, of course, could not and did not determine what damages, if any, resulted from the failure to comply. It follows that if the trial court had granted plaintiffs' motion, there would have been no final judgment, and therefore nothing from which an appeal might be taken. By asking this court to reverse the trial court's ruling,

---

[15] That the ruling could not determine liability is shown by the questions posed to the jury on the special verdict form, which recognized that a breach of the indenture agreement might not render BNY liable for damages, and therefore posed a series of questions to be answered if

plaintiffs are in effect asking this court to determine it has no jurisdiction to entertain the appeal. (See *Walton v. Magno* (1994) 25 Cal.App.4th 1237, 1240 [30 Cal.Rptr.2d 815].)

In any event, plaintiffs' position simply is that the verdict was not supported by the evidence (or, as plaintiffs phrase it, whether there is no substantial evidence to support the jury's verdict BNY did not breach the Indentures for Trusts I and II.) " ' "The scope of appellate review of a trial court's denial of a motion for judgment notwithstanding the verdict is to

---

the jury found BNY had done something the indenture contracts prohibited it from doing or had failed to do something the contracts required it to do. For example, as to Trust I, the verdict form asked:

"1. Did defendant BNY Western either (a) do something the Indenture contract for Trust I prohibited it from doing or (b) fail to do something the Indenture contract for Trust I required it to do:

" __Yes __No

"If your answer to question 1 is yes, then answer question 2. If you answered no, skip to the questions for Trust II, below.

"2. As to the acts you found in responding yes to question 1, did plaintiffs know, or could they reasonably have known, prior to June 15, 1997, they had been harmed and that the harm was potentially caused by BNY Western's breach of the Indenture contracts?

" __Yes __No

"If your answer to question 2 is yes, skip to questions for Trust II, below. If your answer to question 2 is no, then answer question 3.

"3. Did any of the acts that you found in responding yes to question 1 involve an error of judgment by BNY Western?

" __Yes __No

"If your answer to question 3 is yes, then answer question 4. If you answered no, skip to question 7.

"4. As to any of the acts that you found involved an error of judgment by BNY Western, was BNY Western's error of judgment either (a) not in good faith or (b) made with negligence in determining the facts pertinent to such judgment?

" __Yes __No

"If your answer to question 4 is yes, go to question 5. If you answered no, skip to question 6.

"5. Were the plaintiffs harmed by the acts that you found in responding yes to question 4?

" __Yes __No

"Go to question 6.

"6. Did any of the acts that you found in responding yes to question 1 not involve an error of judgment by BNY Western?

" __Yes __No

"If your answer to question 6 is yes, then answer question 7. If your answer to question 6 is no, skip to question 8.

"7. As to any acts that you found that did not involve the exercise of judgment by BNY Western, were the plaintiffs harmed by such acts?

" __Yes __No

"Go to question 8.

"8. If you answered yes to either question 5 or question 7 then answer the following[;] if you answered no to both questions 5 and 7 then skip to the questions for Trust II, below:

"What are plaintiffs' damages?

" $__ "

determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's conclusion and where so found, to uphold the trial court's denial of the motion." ' [Citation.]" (*Shapiro v. Prudential Property & Casualty Co.* (1997) 52 Cal.App.4th 722, 730 [60 Cal.Rptr.2d 698].)

Plaintiffs contend the jury reached the wrong verdict because BNY's conduct unquestionably violated section 1.2 of the indenture agreements, requiring the trusts to furnish an officers' certificate and an opinion of counsel "[u]pon any application or request by the Trust to the Trustee [i.e., BNY] to take any action under any provision of this Indenture." Plaintiffs point out, correctly, BNY released funds to Trusts I and II to correct deposit errors and make fee payments even though the trusts had not supported their requests for the release of funds with officers' certificates or opinions of counsel. BNY counters by pointing out section 1.2 of the indenture agreements expressly applies to requests by a trust "under any provision of [the] Indenture," but no provision of the indenture addresses the correction of deposit errors. BNY points out, further, that it introduced evidence the lack of an express provision covering deposit errors did not preclude it from correcting deposit errors. BNY's position is that neither section 1.2 nor reason required it to obtain officers' certificates and opinions of counsel before releasing funds for acts such as correcting deposit errors or paying fees. As one expert witness testified, "[t]here has to be some reasonableness." BNY also points out section 1.2 applies to requests by a *trust*, but the requests at issue were made not by the *trusts* or by their trustees. They were made by the trusts' *administrators*. BNY argues that to the extent such requests are contemplated by the indenture agreements, they are covered by provisions in article 12, which in BNY's view allowed it to act without first receiving an officers' certificate and an opinion of counsel.

The argument assumes a request from the trust administrator is not necessarily a request from the trust itself—an assumption plaintiffs hotly contest. There is, however, evidence supporting BNY's position. The indenture agreements do not use the term "administrator" and "trust" interchangeably. Section 1.2 by its terms applies to the requests of a trust or trustee. Article 12, however, refers in part to actions taken by the administrator. Section 12.4 addresses funds to be distributed to health care providers from the trusts' distribution accounts upon the instructions of the administrator. Section 12.5 addresses funds in the trusts' cash management accounts, directing BNY to retain certain funds in those accounts until the administrator directs BNY to transfer those funds elsewhere, setting forth the documentation the administrator is to furnish in connection with those directions. BNY's expert testified that requests from the administrator, such as requests to correct deposit errors or for fees, complied with these sections and therefore were authorized by the indenture agreements even though the requests were

not accompanied by officers' certificates and the opinions of counsel. It also stands to reason the parties did not intend that ministerial tasks, which might include such things as the correction of deposit errors or payment or repayment of fees, could take place only if there was a supporting officers' certificate and opinion of counsel. In any event, the evidence does not mandate the conclusion the indenture agreements required certificates and opinions for all tasks, however minor or ministerial in nature.

Plaintiffs rely in part on the court's finding, in denying BNY's motion for summary judgment, "[t]he language of § 1.2 is plain and unambiguous." That the court found section 1.2 to be unambiguous when it denied the motion for summary judgment did not preclude it from taking a different view in light of other evidence or arguments developed at trial. In addition, a finding that section 1.2, standing alone, appears to be unambiguous does not establish it applies in all cases to all transactions irrespective of any other provision of the indenture agreements. Section 1.2 is only one section of an extremely complicated and detailed agreement and, having read the agreement, we cannot conclusively say section 1.2 applies to every conceivable action that a trust, a trustee, or an administrator might ask the indenture trustee to take. We find, therefore, BNY was entitled to argue, and the jury to find,[16] that section 1.2 applied only to certain formal discretionary "actions" set out in the indenture agreements, but not to lesser ministerial tasks not specifically addressed in the agreements. It follows that even if the trial court should have considered the merits of plaintiffs' motion for partial JNOV, it would have been required to deny the motion.

## Conclusion

We conclude that none of plaintiffs' arguments require reversal of either the order denying partial JNOV to plaintiffs, or of the order granting a new trial to BNY.

## The Cross-appeal

## I.

## BNY's Motion for JNOV

BNY contends the court erred by denying its motion for JNOV, making several arguments plaintiffs' theory of damages did not justify an award of damages on their cause of action for breach of contract.

---

[16] Although interpretation of a contract is essentially a judicial function (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]), it is the jury's responsibility, as the trier of fact, to resolve any conflicts in the extrinsic evidence properly admitted to interpret the language of a contract. (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912–913 [75 Cal.Rptr.2d 573].)

BNY contends plaintiffs were not entitled to recover losses suffered by noteholders who invested funds after BNY purportedly breached Trust IV's indenture agreement, arguing that at the time of the breach it had no contractual duty to potential investors. Similarly, BNY contends plaintiffs are not entitled to recover losses suffered by Trust I and Trust II investors allegedly arising from BNY's breach of Trust IV's indenture agreement. We do not address these contentions. The parties can litigate them if they so choose, upon retrial.

BNY also complains plaintiffs' theory of causation and damages fails as a matter of law. To the extent the argument is that the trial court essentially concluded plaintiffs failed to produce evidence to support their theory, it is the mirror image of plaintiffs' claim the trial court's grant of a new trial was in effect a grant of a JNOV to BNY. As discussed previously, the trial court, which heard the evidence and was in a position to evaluate the credibility and value of the witnesses' testimony, did not rule that plaintiffs would be unable to prove damages on any theory, and it did not even rule there was no evidence to support the damages actually awarded by the jury. It ruled only that, in its opinion and on its view of the evidence, the jury's ultimate award was based on speculation. In other words, the court made no finding plaintiffs *must* lose or even that they *must* lose on their theory of causation and damages; it found only that the evidence did not justify the jury's verdict. Under such circumstances, the court appropriately and correctly granted BNY's motion for a new trial, and equally appropriately and correctly denied BNY's motion for JNOV.

BNY, citing federal cases such as *AUSA Life Ins. Co. v. Ernst & Young* (S.D.N.Y. 2000) 119 F.Supp.2d 394 (*AUSA*), construing the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.), section 10(b), contends plaintiffs' theory of damages failed as a matter of law. The cited cases recognize that in an action under the Securities Exchange Act of 1934, section 10(b), a plaintiff can recover investment losses only by showing both that the misrepresentation in question caused the plaintiff to act (i.e., "transaction causation"—here plaintiffs' decision to invest, or their failure to cash out early) and the misrepresentation itself was a cause of the loss of the plaintiff's investment (i.e., "loss causation"—here the loss of money resulting from the collapse of the trusts). (See *AUSA*, at pp. 397–398; and also *McGonigle v. Combs* (9th Cir. 1992) 968 F.2d 810, 820.) In addition, a plaintiff is entitled only to those damages the plaintiff can prove were the reasonably foreseeable results of the defendant's acts or omissions. (*AUSA, supra*, at p. 397.) In *AUSA*, for example, the court found an auditor's wrong in allowing inaccu-

rate annual reports to go out may have caused investors to loan money to a corporation, but the auditor was not legally responsible for the loss of that money when the corporation defaulted on the notes. The court reasoned the auditor could not possibly have foreseen that after the loans were made, the corporation would acquire a company that was losing money "at a staggering rate," or that other market factors would intervene to destroy the corporation's business. (*Id.* at pp. 402–403.)

The trial court here never determined loss causation because it found the evidence did not support the jury's determination of transaction causation. BNY essentially asserts plaintiffs never will be able to show loss causation because they cannot show BNY's acts or omissions directly led to the demise of the trusts or, at least, that BNY had any reason to foresee its acts or omissions would lead to the demise of the trusts. According to BNY, the trusts failed because they were mismanaged and, at most, BNY could have foreseen only that plaintiffs might lose the sums BNY allowed the trusts to invest in contravention of the indenture agreements.

We are not wholly unsympathetic to this argument, but this is not a case under the Securities Exchange Act of 1934, section 10(b), and in the context of this appeal, we are unwilling to decide whether, in a state contract action, a plaintiff seeking damages based on lost investments must show not only that the defendant's derelictions were a cause of the decision to invest, but also were a cause of the loss of the investments. In addition, assuming for purposes of argument BNY breached a contractual duty owed to plaintiffs by allowing the trusts to make improper use of plaintiffs' funds, we cannot say as a matter of law either that it was unforeseeable that the funds would be lost or that it was unforeseeable the improper use would contribute to the collapse of the trusts. In addition, in connection with transactional causation, we cannot say as a matter of law no one could have foreseen that an investor would look to and rely on a false indication of prosperity in deciding whether to invest in a trust or in deciding not to withdraw the investment. Indeed, the court in *AUSA* recognized it is foreseeable a perception of a company's prosperity will cause persons to invest in that company. (*AUSA, supra,* 119 F.Supp.2d at p. 402.) Finally, as we noted earlier, because the trial court granted a new trial, it is of little matter the court's own calculation of damages may have been speculative. In sum, we find no reversible error in the trial court's decision to deny BNY's motion for JNOV, but to grant it a conditional new trial, and we decline to limit the theories of causation or damages plaintiffs may employ upon retrial.

## II.

## Costs

■ BNY contends the court erred by awarding costs to plaintiffs. Section 1032 provides that the prevailing party is entitled as a matter of right to recover costs in any action or proceeding. (§ 1032, subd. (b).) "Prevailing party" is defined as including "the party with a net monetary recovery, a defendant in whose favor a dismissal is entered, a defendant where neither plaintiff nor defendant obtains any relief, and a defendant as against those plaintiffs who do not recover any relief against that defendant." (§ 1032, subd. (a)(4).) Here, while the court's order granting a conditional new trial proposed to award $3,051,552.70 to plaintiffs, plaintiffs have not accepted that condition, and, at this point, they have no monetary recovery from defendant and therefore no right to costs.[17] Our opinion is not altered by the court's order that BNY was to return $132,433 to Trust IV, representing funds improperly used to defend BNY in this action. The order, while conferring a monetary benefit on Trust IV, conferred no benefit directly on plaintiffs.

Not content to argue that plaintiffs are not prevailing parties, BNY argues that *it* must be deemed the prevailing party and is entitled to its costs. The argument is premature. BNY has not obtained dismissal, and, until the matter is retried, it cannot be determined whether plaintiffs will or will not obtain a "net monetary recovery." BNY points out it obtained a defense verdict as to the claimed breaches of Trust I's and Trust II's indenture agreements, but a party that receives a net monetary recovery is entitled to its costs even if the party did not prevail on all causes of action asserted. (*Michell v. Olick* (1996) 49 Cal.App.4th 1194, 1198–1199 [57 Cal.Rptr.2d 227].)

## III.

## BNY's Right to Offset

As part of a protective cross-appeal, BNY contends the trial court erred in ruling it was not entitled to an offset for the value of the settlements plaintiffs reached with the other defendants.

■ Section 877 provides, as relevant: "Where a release . . . is given in good faith before verdict or judgment to one or more of a number of

---

[17] The trial court apparently was of the opinion that plaintiffs were entitled to a monetary recovery, reasoning they could accept the remittitur if the order was affirmed on appeal. As we noted earlier, by taking the appeal, plaintiffs effectively cut off any right they had to the award available by reason of the court's conditional order granting a new trial. (*Swett v. Gray, supra,* 141 Cal. at p. 70.)

tortfeasors claimed to be liable for the same tort, or to one or more other co-obligors mutually subject to contribution rights, it shall have the following effect: [¶] (a) It shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release . . . . [¶] (b) It shall discharge the party to whom it is given from all liability for any contribution to any other parties." Three interests are at work in section 877. " 'First . . . is maximization of recovery to the injured party for the amount of his injury to the extent fault of others has contributed to it. . . . Second is encouragement of settlement of the injured party's claim. . . . Third is the equitable apportionment of liability among the tortfeasors.' " (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 304 [216 Cal.Rptr. 443, 702 P.2d 601].) It follows that the "statute must be interpreted to allow the plaintiff full recovery to the extent that others are responsible for his injuries." (*Ibid.*) However, an additional purpose of the statute is to prevent double recovery for the same wrong. (*Lafayette v. County of Los Angeles* (1984) 162 Cal.App.3d 547, 554 [208 Cal.Rptr. 668].)

■ Plaintiffs' claim against BNY, whether stated as a contract claim or a tort claim, was in essence a claim of negligence in the performance of contractual duties that allowed the other defendants to obtain and lose plaintiffs' investments. Thus, plaintiffs' theory of liability sought to recover from BNY the value of their lost investments, exactly the same loss plaintiffs sought to recover from the other defendants. Allowing BNY an offset for sums paid to settle plaintiffs' claims against the other defendants would, therefore, further the interests behind section 877. Plaintiffs, however, contend section 877 does not apply because, although they at first proceeded against BNY in both tort and contract, they later dismissed their tort claims. They argue that because BNY technically was not a tortfeasor, section 877 simply does not apply, meaning, in effect, plaintiffs might obtain a double recovery. Neither party has cited a case directly on point, but the cases they do cite establish that the statute should be broadly construed to effect its underlying purposes. (E.g., *Bobrow/Thomas & Associates v. Superior Court* (1996) 50 Cal.App.4th 1654, 1662, fn. 2 [58 Cal.Rptr.2d 626] ["The joint tortfeasor concept has taken on a new meaning under current principles of comparative fault, apportionment of damages and releases that no longer discharge all joint tortfeasors."]; *Considine Co. v. Shadle, Hunt & Hagar* (1986) 187 Cal.App.3d 760, 767 [232 Cal.Rptr. 250] [the term "joint tortfeasors" as used in § 877.6 (which works in concert with § 877) is not limited to those who act in concert to cause an injury]; *Lafayette v. County of Los Angeles, supra,* 162 Cal.App.3d at pp. 555–556 [it is not necessary a settling defendant be in fact liable for the same tort as the nonsettling defendant; it is enough that the settling defendant was claimed to be liable for the same tort].)

In our view, for purposes of section 877, BNY *was* sued as a tortfeasor, even if plaintiffs ultimately proceeded only on their contract claims. Plaintiffs' settlement with the other defendants occurred before they dismissed their tort claims against BNY. Moreover, and more importantly, plaintiffs' theory against BNY throughout the proceedings was in effect a theory of negligence, and under that theory plaintiffs were attempting to recover the same loss from BNY that they had sought to recover from the other defendants.[18] Nonetheless, the parties may have arguments or authorities they did not submit to us, and the state of the law may evolve by the time this case is retried. We therefore decline to resolve the point here.

If after retrial damages are awarded to plaintiffs, then the trial court will have to determine, based on plaintiffs' theory of recovery, whether those damages amount to double recovery from BNY and the settling defendants, if BNY and the settling defendants were joint tortfeasors, and/or if BNY was a co-obligor with rights of contribution from the settling defendants. If so, then BNY would be entitled to an offset for the value of those settlements.

Finally, we take no position here as to whether any offset should or should not include any amount of the settlement attributable to loss resulting from the collapse of Trusts I and II. While it is true the jury found BNY did not breach the indenture agreements for either Trust I or Trust II, plaintiffs' theory has been BNY's breach of Trust IV's indenture agreement caused them to lose a portion of their investments in Trusts I and II because but for that breach they would have withdrawn their funds before they were entirely lost. While it seems that to the extent plaintiffs seek to recover that loss BNY should be entitled to an offset, we think the question is one better litigated upon retrial after the type and extent of plaintiffs' recovery, if any, is determined.

## CONCLUSION

As there was sufficient evidence supporting the jury's determination BNY breached Trust IV's indenture agreement and plaintiffs suffered resulting damages, the court properly denied BNY's motion for JNOV. The court erred in awarding costs to plaintiffs.

---

[18] Section 877 no longer limits its application to "tortfeasors claimed to be liable for the same tort," extending its reach to "one or more other co-obligors mutually subject to contribution rights." Section 877.6 refers to "joint tortfeasors or co-obligors on a contract debt." These provisions, while not expressly addressing the situation present here, further support the conclusion the Legislature intended section 877 to define the rights of all persons jointly responsible for the same wrong or the same loss.

## DISPOSITION

The order granting BNY a new trial is affirmed. The orders denying plaintiffs partial judgment notwithstanding the verdict, and denying BNY judgment notwithstanding the verdict, are affirmed. The order awarding statutory costs to plaintiffs is reversed. BNY is awarded appellate costs incurred in responding to the appeal. Plaintiffs are awarded appellate costs incurred in responding to BNY's argument that the trial court erred in denying its motion for judgment notwithstanding the verdict.

Marchiano, P. J., and Swager, J., concurred.

A petition for a rehearing was denied February 22, 2008, and the opinion was modified to read as printed above. The petition of plaintiffs and appellants for review by the Supreme Court was denied April 30, 2008, S161619. Corrigan, J., did not participate therein.