Filed 11/16/21  Charvat v. San Diego Family Housing CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| MATTHEW CHARVAT et al., | D077296 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2018-00002360-CU-PO-CTL) |
| SAN DIEGO FAMILY HOUSING, LLC et al., | |
| Defendants and Respondents. | |

APPEALS from orders of the Superior Court of San Diego County, Randa Trapp, Judge.  Affirmed.

Williams Iagmin, Jon R. Williams; Green Bryant & French and Matthew T. Poelstra, for Plaintiffs and Appellants.

Gordon Rees Scully Mansukhani, Don Willenburg, Kristin Reyna Dehart, and Matthew Nugent, for Defendants and Respondents.

Matthew Charvat, Leigh Charvat, and their two minor children filed this lawsuit against their former landlord, San Diego Family Housing, LLC (SDFH), and its property manager, Lincoln Military Property

Management LP (Lincoln).[1] Alleging negligence and breach of contract, among other claims, the Charvats sought damages based on SDFH and Lincoln's failure to prevent, investigate, and remediate mold in their rental home. After a three-week trial, a jury found in favor of the Charvats. It awarded them approximately $45,000 in economic damages and $2 million in noneconomic damages.

After entering judgment, the trial court granted SDFH and Lincoln's motion for a new trial, limited to the issue of noneconomic damages. The court concluded that the $2 million award of noneconomic damages was excessive. It wrote, "The evidence presented does not support such a high amount for what appears to be temporary nasal symptoms, insomnia and irritability, breathing difficulties, tiredness and Mrs. Charvat feeling like she lost a year. Plaintiffs' minimal medical treatment and the temporary nature of the symptoms, diagnosed as common illnesses such as upper respiratory infections, nasal obstruction and/or rhinitis, and resolving after they left the home, does not support an award of $500,000 for each plaintiff for a combined award of $2 million in past pain and suffering and emotional distress."

The Charvats appeal the new trial order. They contend the court's statement of reasons was insufficient and its decision on the merits was an abuse of discretion. We disagree and affirm the order.

The Charvats also appeal an order imposing monetary sanctions for disclosing a confidential mediation communication. They contend the communication was not related to an ongoing mediation and thus not confidential. We find no abuse of discretion and affirm the sanctions order as well.

---

[1] To avoid confusion, we refer to Matthew and Leigh Charvat by their first names. It is unnecessary to name their minor children.

FACTUAL AND PROCEDURAL BACKGROUND

The Charvats moved to San Diego in April 2015 and leased a townhome from SDFH and Lincoln. Matthew is an active duty member of the United States Marine Corps, and SDFH and Lincoln provide housing to military families. The Charvats lived in the townhome until April 2016.

During their time in the townhome, the Charvats came to believe that mold in the townhome was making them sick. The jury agreed. It found that SDFH and Lincoln breached their lease agreement with the Charvats and violated various common law duties by providing a townhome to the Charvats that was contaminated with mold, performing inadequate inspections that failed to detect the presence of mold, and otherwise failing to meet their obligations to ensure the townhome was habitable and maintain it as such. Because the jury's liability verdict is undisputed on appeal, we provide only a summary of the relevant events and circumstances.

Leigh called Lincoln in May 2015 to report water intrusion under the back door. A Lincoln maintenance worker came and replaced or repaired the weather stripping. Later, in late January 2016, Leigh reported a "dirty sock" smell in the house, especially the laundry room. She told Lincoln her family had been lethargic and not feeling well. Leigh thought it might be carbon monoxide. A Lincoln worker came over and did not find any evidence of carbon monoxide. The Charvats still suspected something was wrong, so Matthew called Lincoln a few days later. Two Lincoln workers looked around the house and checked several places with a moisture meter and an infrared camera. They told Leigh they did not find anything.

A couple weeks later, in mid-February, the Charvats used their air conditioning on an unseasonably warm night. They felt more fatigued afterwards, so they began looking at their air vents. They found mold on the

3

vents in their daughter's room and their son's room. They took pictures and cleaned the vents with dish soap. They thought they saw mold in the air ducts as well.

Leigh contacted Lincoln again and told them about the mold. Two Lincoln maintenance workers came out a couple days later, after a long weekend, and looked at the vents. One worker took a vent and, according to the Charvats, promised to have it tested for mold. (Despite following up, the Charvats never received confirmation that the vent was tested or the results of any such test.)

A few hours later, a Lincoln representative called the Charvats and said Lincoln would schedule a cleaning of the townhome's HVAC system. The HVAC system was cleaned the next day, and all of the vents were replaced. The HVAC cleaner told Leigh he did not see any mold, but he was not qualified to inspect or remediate mold contamination. Lincoln did not tell the HVAC cleaner about the Charvats' report of mold, and they asked him only to perform a standard cleaning.

Leigh testified that, a week or two after the cleaning, they decided to take off the vents again. They saw dirt and what appeared to be mold on the drywall. They decided to do their own testing and contacted an outside vendor. The vendor conducted a test of one swab from the kitchen and found cladosporium mold.

A week later, the Charvats showed two Lincoln employees the mold they believed was in the drywall. They did not mention their testing. The Charvats both testified they had decided to "keep [Lincoln] in the dark" about the mold report.

The Lincoln employees said it was not mold; they told the Charvats it was " 'just dirt.' " The next day, in early March 2016, the Charvats gave their

4

30-day notice to vacate the townhome. Leigh testified they wanted to move because they were concerned about their health. But on their notice to vacate, their reason for leaving was, " 'Moving out of town.' "

At the end of March, the Charvats got a second mold test from a different vendor. That company did some air sampling in addition to surface tests. It found cladosporium in one air sample. Before moving out, the Charvats contacted a third vendor for additional tests. Matthew testified he wanted "a third opinion." The third company took air samples and found elevated levels of mold spores in the home. The Charvats did not share these results with Lincoln either.

Leigh and the children moved out of the townhome on April 2, 2016, and Matthew joined them a few days later. They told their new landlord their reason for moving was to " '[m]ove to [a] suburban school district.' "

The Charvats decided to throw away many of their personal possessions because they believed they might be contaminated with mold. But the Charvats did not see any visible mold on the belongings or do any tests to see whether they were contaminated. These possessions included the children's stuffed animals and a bear with a recording of Matthew's deceased father's voice.

While in the townhome, the Charvats suffered various physical ailments and mental distress. The nature, cause, and timing of these symptoms were disputed at trial.

As to the onset of their symptoms, Leigh testified that her family began to feel sick about two months after they moved into the townhome. She was impeached by evidence that she told a Lincoln representative, in January 2016, that her family had only started feeling lethargic in the past three days or so. Similarly, a few weeks later, after she and Matthew found

5

evidence of mold, Leigh told Lincoln she thought she had found what had been making the family sick " 'for the past month.' " She said, " 'It's been about three to four weeks of this, of me really noticing symptoms.' "

Leigh testified that her family's health remained poor after the HVAC cleaning. But she acknowledged telling a Lincoln representative at the time, " 'So far, good. It smells good,' " when he asked how they were feeling. She also told him "everything was fine."

As to specific symptoms, Leigh said she felt irritable and tired all the time. She also had nasal congestion and headaches. She used over-the-counter medications, which helped but only temporarily.

The Charvats' daughter, who was around five years old at the time, began having trouble sleeping. She also had headaches.

Their son, who was almost three, had previously been diagnosed with a grass allergy. In the townhome, he was moody and threw tantrums. He held his head like it hurt, and he had very loud breathing at night. The family said he "sounded like Darth Vader." He had a runny nose, and Leigh gave him allergy medication.

Matthew had been previously diagnosed with attention deficit hyperactivity disorder (ADHD) and had a history of seasonal allergies. He took over-the-counter allergy medication. He testified that he started to cough about a month after they moved into the townhome. He would sometimes "spit stuff up" and also have "dry cough that would make [him] gag in a way." This happened on a biweekly or monthly basis. Matthew went to a Marine Corps doctor, who mentioned "an allergy thing" and prescribed nasal spray. Matthew also had "extreme fatigue," though he

admitted that other medication was potentially affecting his physical energy.[2]

Early in their stay at the townhome, Leigh took the children to a doctor because they had been congested and were coughing. The children were prescribed an antibiotic for an upper respiratory infection. She said the children had chronic congestion and "allergy type" symptoms, but "[i]t was never anything being over the top worse where it would warrant a doctor's appointment for whatever."

A couple months later, Leigh took her daughter to an emergency room because she was "gasping" while sleeping. It scared Leigh. But the doctor "really didn't say much" and prescribed her an antihistamine. The Charvats' daughter continued to have trouble sleeping. They saw a series of doctors, who diagnosed the daughter with nasal congestion, allergic rhinitis, dark circles under the eyes, and snoring. One doctor prescribed a nasal spray. (Separately, the Charvats' daughter was diagnosed with ADHD as well.)

After moving out of the townhome, the Charvats felt markedly better. Leigh testified it was like "[n]ight and day." They had some lingering issues, but they were manageable. Leigh agreed that the symptoms she attributes to being in the townhome were gone by the month after moving out. Leigh still had some congestion, and a test revealed she was allergic to dust mites. Their daughter had some nasal problems, and Leigh told their doctor it was

---

[2]     One doctor's note, from August 2015, stated, "He feels he's doing fine with the dietary modifications he's made, lower sugar and carbs. However, his wife has reportedly said that she wants him on some sort of medication. He thinks he's doing well at work, but he is less productive at home. He didn't like the Vyvanse [a stimulant] as he thought he was less motivated. He thought the Adderall [another stimulant] made him too cracked out."

allergies. Matthew testified it was more of "a slow decline." He continued to have allergic rhinitis and took allergy medication.

Leigh testified that, during their time in the townhome, she was "miserable" because of her family's health issues. She felt "like a whole year had just been taken from [them]." Throwing out their personal possessions was very upsetting for Leigh and very hard on the children.

The Charvats called a medical expert at trial, who testified that the family had "very typical what are called irritant upper respiratory tract symptoms," including "nasal congestion, drainage, sneezing, coughing, things like that." He opined that these symptoms were caused at least in part by the damp and moldy environment in the townhome. On cross-examination, the expert agreed that Leigh's symptoms were also at least partially related to her pollen allergies. Similarly, he could not rule out Matthew's various preexisting allergies as a cause of his symptoms.

SDFH and Lincoln also presented testimony from a medical expert. Their expert opined that there was insufficient evidence to conclude that the Charvats' symptoms were caused by the indoor environment in the townhome.

For their economic damages, the Charvats requested approximately $28,000 in rent paid to Lincoln, $8,500 in lost personal property, $500 in moving expenses, and $4,000 in other out-of-pocket expenses. These amounts would be divided equally between Leigh and Matthew. The Charvats also requested past medical expenses of approximately $1,800 for Leigh, $1,500 for their daughter, and $1,200 for their son.

For their past noneconomic damages, the Charvats requested $500,000 each. Their attorney argued, in closing, that "anything less than the $500,000 . . . would not do justice to them."

8

The jury largely agreed. It awarded the Charvats a total of approximately $45,000 in economic damages, including $28,000 in rent and $4,500 in medical expenses, as requested. It awarded $500,000 in noneconomic damages to each Charvat family member, also as requested. The trial court entered judgment accordingly.

SDFH and Lincoln moved for a new trial. They primarily contended (1) the evidence was insufficient to establish their liability and (2) the jury's noneconomic damage award was excessive. As to noneconomic damages, SDFH and Lincoln argued that "each Plaintiff's relevant discomfort took place over the space of only a few months. The worst of the claimed injuries were roughly the same as a severe common cold, or bad allergy attack." They pointed to the identical noneconomic damage awards as evidence the jury did not separately consider each family member's individual circumstances. They calculated the ratio of Charvats' economic damages to their noneconomic damages and claimed they were severely imbalanced. They also argued the award was not consistent with other recent jury verdicts in San Diego.

In opposition, the Charvats maintained that they experienced "continuous and enduring physical pain and suffering, discomfort, annoyance, inconvenience, worry, stress and loss of quality of life as it related to their individual and collective pain and suffering, as well as the stress of having to throw away their personal property items . . . ." They argued that comparing the relative sizes of the jury's economic and noneconomic damages was improper. They contended the jury's verdict was amply supported by the evidence and there was no indication the jury was misled.

In advance of the hearing on SDFH and Lincoln's motion, the trial court issued a tentative ruling granting the motion in part, as to the

9

Charvats' noneconomic damages. At the hearing, in addition to addressing the evidence, the Charvats again criticized SDFH and Lincoln's reliance on a ratio between economic and noneconomic damages. The Charvats also requested that the court issue a conditional remittitur if it was inclined to grant the motion.

The court confirmed its tentative ruling. In its oral comments, it stated, "In this case, the evidence produced at trial as to pain and suffering and emotional distress isn't sufficient to support the amount of the award. And . . . that determination is not based on [a] ratio. [¶] The Court sat through the entire trial. The Court has endeavored to do [its] best to follow the law as it relates to my duty when it comes to a motion for new trial." The court also read through pertinent portions of its tentative ruling.

After the hearing, the court issued a written order granting SDFH and Lincoln's motion in part. Because the Charvats challenge the sufficiency of the court's explanation for granting a new trial, we reproduce the relevant portion of the order in full:

> "MOTION FOR A NEW TRIAL by defendants San Diego Family Housing LLC and Lincoln Military Property Management LP is GRANTED. ([Code Civ. Proc.,] § 657(5)[.])
>
> "The $500,000 awarded to each of the four plaintiffs for past pain and suffering and past emotional distress is excessive.
>
> "Plaintiffs moved into a rental home on April 29, 2015 and moved out on April 1, 2016. Evidence was presented that the family reported feeling tired and ill starting about January 25, 2016. Plaintiffs discovered mold on the property on February 12, 2016. The family claimed they experienced illness, pain and suffering and emotional distress allegedly from the presence of mold in their rental. The symptoms apparently resolved at some point after they vacated the premises.

"The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. (*Janice H. v. 696 North Robertson, LLC* (2016) 1 Cal.App.5th 586, 602[.]) The judge is not permitted to substitute her judgment for that of the jury on the question of damages unless it appears from the record the jury verdict was improper. (*Bigboy v. County of San Diego* (1984) 154 Cal.App.3d 397, 406[.] [(*Bigboy*)][.]) If a cause of action is otherwise established, it is settled that damages may be given for mental suffering naturally ensuing from the acts complained of. The unitary concept of "pain and suffering" has served as a convenient label under which a plaintiff may recover not only for physical pain but for fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal. Admittedly these terms refer to subjective states, representing a detriment which can be translated into monetary loss only with great difficulty. But the detriment, nevertheless, is a genuine one that requires compensation. (*Capelouto v. Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 892-893[.])

"The evidence produced at trial as to pain and suffering and/or emotional distress is insufficient to support the amount of the award.

"Mrs. Charvat testified that prior to moving into the subject property, she never observed the children having any significant illnesses or sickness. But after they moved in, she felt tired and felt out of it on a daily basis, causing her to be irritable. She had a non-stop runny nose, congestion and frequent night sweats. She was miserable every day. Her relationship with her husband deteriorated because they were always trying to figure out what was wrong and both were always tired. Her children's problems were draining her. She testified 'it was like a whole year had just been taken from us. A whole year.'

"Mr. Charvat did not get sick before moving into the home. He was typically a loud and hyper person and always active. But while occupying the property, he had a constant dry cough and was congested. He was fatigued

11

and exhausted and would fall asleep on the couch when he came home from work. He coughed and spit up brown stuff into the sink. He is allergic to mold. He did not seek past medical expenses.

"[The Charvats' daughter], who was five to six years old at the time, could not sleep because she had problems breathing. She had congestion, causing her to be moody and irritable. She was taken to the doctor for coughing and congestion in May 2015. The doctor prescribed antibiotics for an upper respiratory infection. She was taken to the Emergency Room in July 2015 because she was 'gasping for air' at night while sleeping and again diagnosed with an upper respiratory infection. She saw an ENT and an allergist and was diagnosed with nasal obstruction/allergic rhinitis.

"[The Charvats' son], who was two to three years old at the time, would hold his ears and scream, 'my ears, my head.' His breathing at night was loud and also when he was playing with his head down. He would have meltdowns and became difficult to deal with. His breathing issues did not end until 2017 after they left the home.

"Three of the four plaintiffs were awarded medical expenses totaling $4,546.46, yet all four family members were awarded $500,000 each for past pain/suffering and past emotional distress. The evidence presented does not support such a high amount for what appears to be temporary nasal symptoms, insomnia and irritability, breathing difficulties, tiredness and Mrs. Charvat feeling like she lost a year. Plaintiffs' minimal medical treatment and the temporary nature of the symptoms, diagnosed as common illnesses such as upper respiratory infections, nasal obstruction and/or rhinitis, and resolving after they left the home, does not support an award of $500,000 for each plaintiff for a combined award of $2 million in past pain and suffering and emotional distress. (See[] *Thompson v. John Strona & Sons* (1970) 5 Cal.App.3d 705[.])

"The court will order a new trial on the issue of damages for past pain and suffering and past emotional distress only.

12

The Motion is denied as to the other grounds raised." (Bold type omitted.)

The Charvats appealed.

Two months after the new trial order, SDFH and Lincoln moved for sanctions and a protective order based on the alleged disclosure of a confidential mediation communication by the Charvats' attorney. After briefing and argument, the trial court imposed $1,600 in sanctions but declined to issue a protective order because no further disclosures were threatened or likely. The Charvats appealed the sanctions order as well. Additional facts and procedural details regarding the sanctions order are provided in the relevant section below.

DISCUSSION

I

*New Trial Order*

A trial court may grant a new trial based on "[e]xcessive or inadequate damages." (Code Civ. Proc., § 657, subd. (5).) To do so, the court must weigh the evidence and be "convinced from the entire record, including reasonable inferences therefrom, that the . . . jury clearly should have reached a different verdict or decision." (*Id.*, § 657.)

"The powers of a trial court in ruling on a motion for new trial are plenary. The California Supreme Court has held that the trial court, in ruling on a motion for new trial, has the power 'to disbelieve witnesses, reweigh the evidence, and draw reasonable inferences therefrom contrary to those of the trier of fact' [citation], that the court sits as 'an independent trier of fact' [citation] and that it must 'independently assess[] the evidence supporting the verdict' [citation]. The trial judge has 'to be satisfied that the evidence, as a whole, was sufficient to sustain the verdict; if he was not, it

13

was not only the proper exercise of a legal discretion, but his duty, to grant a new trial.'" (*Barrese v. Murray* (2011) 198 Cal.App.4th 494, 503 (*Barrese*).)

As one early opinion explained, "The trial court cannot rest upon a conflict in the evidence, but must weigh and consider the evidence for both parties, and determine for itself the just conclusion to be drawn from it. 'Where the decision is against the weight of the evidence[,] it is the duty of that court to grant a new trial.' . . . Of course, the judge should give due respect to the verdict of the jury, and may sometimes properly deny a new trial in cases where[,] if submitted to him without a jury[,] he might[,] upon the evidence[,] have made a different decision. He must be clearly satisfied that the verdict is wrong; otherwise he should let it stand. But in considering the question upon the motion he must act upon his own judgment as to the effect of the evidence. The parties are entitled to the judgment of the jury in rendering a verdict in the first instance; but upon a motion for a new trial they are equally entitled to the independent judgment of the judge as to whether such verdict is supported by the evidence." (*Green v. Soule* (1904) 145 Cal. 96, 102-103 (*Green*).)

"The standards for reviewing an order granting a new trial are well settled. After authorizing trial courts to grant a new trial on the grounds of '[e]xcessive . . . damages' or '[i]nsufficiency of the evidence,' [Code of Civil Procedure] section 657 provides: '[O]n appeal from an order granting a new trial upon the ground of the insufficiency of the evidence . . . or upon the ground of excessive or inadequate damages, . . . *such order shall be reversed as to such ground only if there is no substantial basis in the record for any of such reasons*.' (Italics added.) Thus, [our Supreme Court has] held that an order granting a new trial under section 657 'must be sustained on appeal unless the opposing party demonstrates that no reasonable finder of fact

14

could have found for the movant on [the trial court's] theory.' [Citation.] Moreover, '[a]n abuse of discretion cannot be found in cases in which the evidence is in conflict and a verdict for the moving party could have been reached . . . .' [Citation.] In other words, 'the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the [new trial] order.' " (*Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 411-412 (*Lane*).)

"The reason for this deference 'is that the trial court, in ruling on [a new trial] motion, sits . . . as an independent trier of fact.' [Citation.] Therefore, the trial court's factual determinations, reflected in its decision to grant the new trial, are entitled to the same deference that an appellate court would ordinarily accord a jury's factual determinations. [¶] The trial court sits much closer to the evidence than an appellate court. Even the most comprehensive study of a trial court record cannot replace the immediacy of being present at the trial, watching and hearing as the evidence unfolds. The trial court, therefore, is in the best position to assess the reliability of a jury's verdict and, to this end, the Legislature has granted trial courts broad discretion to order new trials. The only relevant limitation on this discretion is that the trial court must state its reasons for granting the new trial, and there must be substantial evidence in the record to support those reasons." (*Lane*, *supra*, 22 Cal.4th at p. 412.)

Thus, "when a motion for new trial is granted on the ground of excessive damages . . . , the order will not be reversed unless it plainly appears the court has abused its discretion, ' "and the cases teach that when there is a material conflict of evidence regarding the extent of damage the imputation of such abuse is repelled, the same as if the ground of the order were insufficiency of the evidence to justify the verdict." ' " (*Dell'Oca v. Bank*

15

*of New York Trust Co., NA* (2008) 159 Cal.App.4th 531, 547 (*Dell'Oca*), quoting *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 933.)

The trial court here granted a new trial, limited to noneconomic damages, because it found the evidence regarding the Charvats' pain, suffering, and emotional distress did not support an award of $500,000 to each plaintiff. The record reveals substantial room for disagreement regarding the nature and extent of the noneconomic injuries suffered by the Charvats as a result of SDFH and Lincoln's wrongful acts. While the Charvats described their experiences in vivid detail, their symptoms could reasonably be seen as fairly minor and ultimately temporary, as the trial court found. Moreover, "[d]etermining the amount of money a plaintiff is to be awarded as compensation for noneconomic injuries is '[o]ne of the most difficult tasks imposed on a fact finder.' [Citation.] 'The inquiry is inherently subjective and not easily amenable to concrete measurement.' [Citation.] Naturally, therefore, the appropriate amount of noneconomic damages is ' "a matter on which there legitimately may be a wide difference of opinion." ' " (*Burchell v. Faculty Physicians & Surgeons etc.* (2020) 54 Cal.App.5th 515, 527.) Given the evidence in the record, and the inherent lack of certainty surrounding the proper measure of noneconomic damages, it is clear there was a " ' "material conflict of evidence regarding the extent of damage" ' " suffered by the Charvats and the trial court's order must be affirmed. (*Dell'Oca, supra*, 159 Cal.App.4th at p. 547; see *Thompson v. John Strona & Sons* (1970) 5 Cal.App.3d 705, 711-712.)

The Charvats' arguments to the contrary appear to reflect an incomplete understanding of the trial court's role as an independent factfinder on a motion for a new trial. For example, they assert, "Trial judges are not empowered to substitute their own judgment for that of the jury."

But, on a motion for new trial, the court may disbelieve witnesses the jury may have believed, draw inferences contrary to the jury's verdict, and weigh the evidence differently than the jury. (*Barrese*, *supra*, 198 Cal.App.4th at p. 503.) The trial court *is* empowered to substitute its own judgment for the jury if the court believes the weight of the evidence is contrary to the jury's verdict. (*Ibid.*; accord, *Green*, *supra*, 145 Cal. at pp. 102-103.)

The Charvats' briefing reflects, in part, an effort to apply the standards of review when an appellate court considers a claim of excessive damages to a trial court's consideration of a motion for new trial. The two situations are not comparable. " 'The powers and duties of a trial judge in ruling on a motion for new trial and of an appellate court on an appeal from a judgment are very different when the question of an excessive award of damages arises. The trial judge sits as a thirteenth juror with the power to weigh the evidence and judge the credibility of the witnesses. If he believes the damages awarded by the jury to be excessive and the question is presented[,] it becomes his duty to reduce them. [Citing cases.] When the question is raised his denial of a motion for new trial is an indication that he approves the amount of the award. An appellate court has no such powers. It cannot weigh the evidence and pass on the credibility of the witnesses as a juror does. To hold an award excessive it must be so large as to indicate passion or prejudice on the part of the jurors.' " (*Seffert v. Los Angles Transit Lines* (1961) 56 Cal.2d 498, 507.)[3]

---

[3] We note, specifically, the well-established rule that a trial court is not required to find passion or prejudice on the part of the jury to justify granting a new trial based on excessive damages. (See, e.g., *Koyer v. McComber* (1938) 12 Cal.2d 175, 182.) Decades ago, language purporting to require such a finding was removed from the statute as unnecessary. (See Legis. Com. com., 16A West's Ann. Code Civ. Proc., foll. § 657.)

17

The Charvats repeatedly premise their arguments on what "the jury reasonably concluded," what "it was reasonable for the jury to conclude," and what "the jury could [also have] found." But, on review of an order granting a new trial, our focus is not what the jury could reasonably conclude but whether the contrary conclusion reached by the trial court was reasonable. " '[T]he presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the [new trial] order.' " (*Lane*, *supra*, 22 Cal.4th at p. 412.) "[S]o long as the outcome is uncertain at the close of trial," i.e., in this case, as long as the evidence would support either the jury's verdict or a considerably lower noneconomic damages award, "a properly constructed new trial order is not subject to reversal on appeal." (*Id.* at p. 414; see *Dell'Oca*, *supra*, 159 Cal.App.4th at p. 547 [question on appeal is simply whether the evidence would support " ' "a verdict for an amount considerably less" ' " than the jury's award].)

The Charvats claim the trial court's order "scarcely mentioned the Charvats' physical symptoms and ailments in an attempt to minimize the pain and suffering the jury obviously attached to them," and they emphasize the "frustration and indignities the Charvats continuously suffered" that "was likely palpable to the jury, but nowhere mentioned by" the trial court's order. They argue the trial court's alleged failure to credit this "additional compelling evidence" shows its error. The Supreme Court in *Lane* addressed and rejected this line of argument. The Court of Appeal opinion under review had "noted that, '[w]hile the trial court's order sets forth many factual reasons for granting a new trial, many of these facts do not take into account the conflicting evidence in support of the jury verdicts.' " (*Lane*, *supra*, 22 Cal.4th at p. 416.) The Supreme Court "reject[ed] the premise of this argument. Conflicting evidence—far from supporting the Court of Appeal's

18

decision to reinstate the jury's verdict—actually places the new trial order beyond review so long as the conflict relates to the trial court's reasons for granting a new trial. 'An abuse of discretion [warranting reversal of a new trial order] *cannot be found* in cases in which the evidence is in conflict . . . .'" (*Ibid.*)

More specifically, the Charvats contend the court relied on improper criteria in deciding to order a new trial, specifically (1) the ratio between the jury's awards of economic and noneconomic damages and (2) the amounts awarded by juries in other trials in San Diego. But, even assuming these considerations were improper, the Charvats have not shown the court relied on them. They do not appear in the trial court's order or in its comments at the hearing. Indeed, the court specifically disclaimed relying on the damages ratios when the Charvats raised it. The court noted the family's medical expenses in its order, but that was a relevant fact for the court to consider. It did not reflect the use of an improper ratio. The Charvats point to SDFH and Lincoln's briefing, but the presence of allegedly improper criteria in a party's briefing does not show the trial court relied on it in making its order. (See *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 ["A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness."]; *Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 631 ["A ruling by a trial court is presumed correct, and ambiguities are resolved in favor of affirmance."].)

The Charvats rely heavily on this court's opinion in *Bigboy*, *supra*, 154 Cal.App.3d 397, but it is distinguishable. In *Bigboy*, the plaintiff suffered "permanent massive injuries" during a car accident. (*Id*. at p. 402.) He was rendered paraplegic and would suffer "phantom pain, muscle spasms and

19

sterility for the rest of his life." (*Ibid.*) The jury awarded him $2.5 million in total past and future damages. (*Ibid.*) The trial court granted a motion for new trial, with a conditional remittitur of $1.75 million. (*Ibid.*) Reviewing the trial court's order, *Bigboy* noted, "it is a futile effort to search the judge's statement of reasons for granting a new trial for any reference to any portion of the evidence that would explain a lesser verdict or which would guide an appellate court in determining whether the 'jury clearly should have reached a different verdict.'" (*Id.* at p. 406.) The order primarily reflected the trial court's finding that "this verdict exceeds the awards given in similar cases," both in the court's "personal experience and . . . in other courts for other plaintiffs." (*Ibid.*) *Bigboy* concluded this finding was inadequate because "the trial judge's personal opinion based on the ranges of awards in other cases does not show the jury should have clearly reached a different verdict in this case[.]" (*Id.* at p. 407.) Here, by contrast, the court did not rely on its "personal opinion based on the ranges of awards in other cases" (*ibid.*); it relied on its assessment of the evidence presented in this case. That the court's assessment differed from that of the jury does not show error.[4]

Separately, the Charvats contend that the content of the order itself was insufficient. The statute provides, "When a new trial is granted, on all or part of the issues, the court shall specify the ground or grounds upon which it is granted and the court's reason or reasons for granting the new trial upon each ground stated." (Code Civ. Proc., § 657.) Our Supreme Court has said "that '[n]o hard and fast rule can be laid down as to the content of such a

---

[4]    *Bigboy* also criticized the trial court's reliance on the fact that the defendant's position was "indefensible" and the plaintiff was "a very attractive client." (*Bigboy*, *supra*, 154 Cal.App.3d at p. 407.) The trial court here did not rely on any similar considerations.

20

specification, and it will necessarily vary according to the facts and circumstances of each case.' [Citation.] However, [it has] emphasized on several occasions that if the ground relied upon is 'insufficiency of evidence,' the trial judge's specification of reasons 'must briefly identify the portion of the record which convinces the judge "that the court or jury clearly should have reached a different verdict or decision." ' " (*Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 60 (*Stevens*).) Although the trial court need not "cite page and line of the record," it must do more than simply identify its conclusions as to the ultimate facts in dispute. (*Miller v. Los Angeles County Flood Control Dist.* (1973) 8 Cal.3d 689, 697 (*Miller*).) This standard is driven by the purposes of the statutory requirement, which are "to encourage careful deliberation by the trial court before ruling on the new trial motion and to make a sufficiently precise record to permit meaningful appellate review." (*Stevens*, at p. 61.)[5]

For example, in *Miller*, the Supreme Court found inadequate a trial court's statement that the defendant " 'completely and adequately discharged any obligation it had in the maintenance of the basin and dam as demonstrated by the overwhelming preponderance of the evidence.' " (*Miller*, *supra*, 8 Cal.3d at p. 696.) The Supreme Court held that this statement "is simply another way of saying that plaintiffs failed to prove the ultimate fact

---

[5] On this issue, *Bigboy* reviewed several cases and noted, "Each of these cases specifically directs the appellate court's attention to some aspect of the record which would have misled or prejudiced the jury and which convinces the trial judge the jury clearly should have reached a different decision." (*Bigboy*, *supra*, 154 Cal.App.3d at p. 405.) To the extent this sentence may be read to require a trial court to identify "some aspect of the record which would have misled or prejudiced the jury," such a requirement is not supported by any citation and appears contrary to the Supreme Court's discussion in *Stevens*, *supra*, 9 Cal.3d at page 60, and elsewhere.

which they were required to establish. This 'reason' fails to identify which aspects of the evidence convinced the trial judge that the [defendant] had properly discharged its duty of maintenance." (*Id.* at p. 698.) It was therefore ambiguous which one of several alternate factual scenarios the trial court found persuasive. (*Id.* at pp. 698-699.)

More recently, in *Estes v. Eaton Corporation* (2020) 51 Cal.App.5th 636, 640 (*Estes*), the court reversed a trial court's grant of a new trial in favor of an asbestos plaintiff based on an insufficient specification of reasons. The reasons amounted to "little more than a conclusion that the plaintiff introduced sufficient evidence to prove that the arc chutes released hazardous levels of asbestos during [plaintiff's] encounter with them in the workplace." (*Id.* at p. 646.) The trial court "did not discuss any of the evidence that convinced it the jury should have reached a verdict in [plaintiff's] favor" or make "detailed factual findings" on the disputed issues. (*Ibid.*)

*Estes* "recognize[d] the trial court 'should not be burdened with giving a comprehensive review of the evidence.' [Citation.] But the Supreme Court has made clear it must say *something* about the evidence, or else . . . make factual findings that are specific and go well beyond ultimate facts. Here, lacking either from the trial court, we can only speculate as to what specifically the trial court concluded with regard to the evidence other than that it was insufficient." (*Estes*, *supra*, 51 Cal.App.5th at pp. 646-647.) For example, like in *Miller*, it was unclear which of several alternate factual scenarios the trial court credited: "[W]e cannot tell which *theory* the court accepted as to how and when [plaintiff] was exposed in the workplace to asbestos dust from [the relevant] products, which was one of several critical

22

contested issues (leaving aside whether such exposure was at harmful levels)." (*Id.* at p. 647.)

By contrast, in *Montoya v. Barragan* (2013) 220 Cal.App.4th 1215, 1226 (*Montoya*), the court found a specification of reasons sufficient where the trial court disagreed with the jury's verdict on causation and wrote, " 'The Court acknowledges that the experts differed on whether [the defendant's] negligence caused [his patient's] death. After weighing that testimony, however, in light of the legal standard that his negligence need not be the only cause of injury, the Court is convinced that the jury's answer should have been different and a new trial is granted.' " The reviewing court explained, "Although the court could have pointed to the specific expert doctors' testimony upon which it relied in concluding that [the defendant's] negligence was a substantial factor, the court isolated the precise issue upon which it based its rationale and pointed out that the conflicting expert evidence left it to conclude that it could not rule out that [the defendant's] negligence caused [his patient's] death." (*Id.* at p. 1229.)

Similarly, in *Romero v. Riggs* (1994) 24 Cal.App.4th 117, 123 (*Romero*), this court found a specification of reasons sufficient because "the trial judge clearly stated not only the *ground* (insufficiency of the evidence), but the *reason* for granting a new trial on the stated ground: 'The medical evidence was overwhelming that the early onset and the severity of the effect upon the plaintiff and his early deterioration of eyesight was a direct and proximate result of the negligent failure of the defendant doctor to diagnose and treat the plaintiff's condition.' " This court held that the order "more than adequately 'directs the appellate court's attention' to the aspects of the record which support the order," i.e., "the 'overwhelming' medical evidence." (*Id.* at p. 124.)

23

The trial court's order here specified both its ground (excessive damages) and its reasons for granting a partial new trial. It outlined the pertinent legal principles, summarized its view of the Charvats' testimony regarding each family member, and discussed why it found the evidence to be insufficient to support the jury's noneconomic damage awards. The court pointed to specific aspects of the record, such as the Charvats' "minimal medical treatment," the "temporary nature of the symptoms," and the fact that the symptoms reflected "common illnesses such as upper respiratory infections, nasal obstruction and/or rhinitis," to support its order.

The court's specification of reasons was more than sufficient. It made specific factual findings and did not rely on bare conclusions as to the ultimate facts in dispute. (See *Miller*, *supra*, 8 Cal.3d at p. 697.) It identified the aspects of the evidence that convinced it the jury's verdict was unsound. (See *Stevens*, *supra*, 9 Cal.3d at p. 60.) Unlike in *Miller* and *Estes*, there is no ambiguity regarding the reasons for the court's new trial order. (Cf. *Miller*, at pp. 698-699; *Estes*, *supra*, 51 Cal.App.5th at p. 647.) The court found the pain, suffering, and emotional distress claimed by the Charvats to be minor, temporary, and consistent with other common illnesses, which would not support an award of $500,000 per plaintiff, or $2 million total.

The court's order satisfies the twin purposes of the new trial statute. (See *Stevens*, *supra*, 9 Cal.3d at p. 61.) Its detailed discussion of the facts and the law, as well as its substantive analysis, reflects careful deliberation. And its specification of reasons is more than adequate to permit meaningful appellate review. We need not speculate why the court ordered a new trial.

The Charvats argue that the order "did not sufficiently identify what aspects of that evidence the trial court believed were unworthy of credit, and which aspects of Charvats' physical symptoms [and] ailments were not

24

entitled to compensation." They also point to evidence of specific types of emotional distress the trial court allegedly failed to acknowledge. But the court is not required to "write a statement of reasons that states the weight and inferences to be drawn from ' "each item of evidence supporting, or impeaching, the judgment." ' " (*Montoya, supra,* 220 Cal.App.4th at p. 1227, quoting *Scala v. Jerry Witt & Sons, Inc.* (1970) 3 Cal.3d 359, 370; accord, *Lane, supra,* 22 Cal.4th at p. 416.) It is sufficient for the trial court to " 'briefly identify the portion of the record which convinces the judge "that the court or jury clearly should have reached a different verdict or decision." ' " (*Stevens, supra,* 9 Cal.3d at p. 60.) The court did so here.[6]

The Charvats also argue that the alleged insufficiency of the order was compounded by the absence of a conditional remittitur. They acknowledge that a court is not required to issue a conditional remittitur in connection

---

[6] The Charvats rely on additional authorities, but they are distinguishable. In *McLaughlin v. San Francisco* (1968) 264 Cal.App.2d 310, 316, the new trial order did not provide any reasons or cite any evidence. It merely stated that the plaintiff had not proved reasonable damages in excess of the court's conditional remittitur. (*Ibid.*) In *Dizon v. Pope* (1974) 44 Cal.App.3d 146, 148, the new trial order stated, " '[T]he plaintiff sustained special damages of $1536.00. The injury was to soft tissue and does not appear to be permanent.' " This cursory treatment was insufficient: "The [trial] court did not set forth how it arrived at the total of special damages mentioned in the order or the significance of its statement regarding soft tissue." (*Id.* at p. 149.) Moreover, the trial court did not discuss any evidence or point to any aspect of the record to support its conclusions. (*Ibid.*) The Charvats claim that the trial court orders in *McLaughlin* and *Dizon* "summariz[ed]" the evidence and were found inadequate, drawing a comparison to the court's order here. But no such summary appears in either order. (*McLaughlin*, at pp. 312-313; *Dizon*, at pp. 147-148.) To the extent the issue was considered, *McLaughlin* held that "the specification of reasons need *not* summarize the evidence to which it refers," which supports the proposition that the order here was even more detailed than necessary. (*McLaughlin*, at p. 315, italics added.)

25

with a new trial order.  (See Code Civ. Proc., § 662.5, subd. (a)(2).)  But they claim a remittitur was necessary "in these particular circumstances" based on the inadequacy of the trial court's specification of reasons.  Because we disagree that the court's specification of reasons was inadequate, the Charvats' argument necessarily fails.  We need not consider it further.

II

*Sanctions Order*

Three months after the new trial order, SDFH and Lincoln moved for a protective order and sanctions based on the alleged disclosure of a confidential mediation communication by the Charvats' attorney.  The parties participated in an in-person mediation session a number of months before trial, and they continued to communicate through the mediator by telephone.  SDFH and Lincoln contended that the Charvats' attorney disclosed a confidential mediation settlement offer to a prominent legal newspaper for inclusion in its "Verdicts & Settlements" section.  In opposition, the Charvats argued that the settlement offer was communicated by SDFH and Lincoln's attorney just prior to trial, after the mediation had ended, and was therefore not confidential.  SDFH and Lincoln replied that their attorney never discussed any terms not previously communicated by the mediator.  (After SDFH and Lincoln objected, the newspaper did not publish the settlement offer.)

At a hearing, the attorney for SDFH and Lincoln explained the circumstances of the pretrial communication and its relationship to the mediation:  "The settlement agreement figure that was communicated by [the Charvats' attorney] to the [legal newspaper] was the same figure that was communicated by the mediator to [the Charvats' attorney].  It's the exact same figure.  When [the Charvats' attorney] had a discussion with me out in

26

the hallway, I did not communicate any settlement agreement figure to him. I simply reiterated that number that was intimated by the mediator to him was our trial settlement figure. . . . [A]nd I would attest and swear under penalty of perjury that I never communicated an actual figure to [the Charvats' attorney], rather than communicated that the amount that he was given was our figure."

In a written order, the court found that the Charvats' attorney had disclosed a confidential mediation communication. It explained, "Based on statements made at oral argument, the best and final settlement offer was first exchanged in mediation. The settlement amount would not have existed without the mediation. Thus, the settlement amount is protected by the mediation privilege and should not have been disclosed." The court imposed sanctions of $1,600 for the disclosure, but it declined to enter a protective order because "[t]here is no evidence of any other mediation related disclosures to third parties or threats to disclose mediation related settlement discussions."

The Charvats contend the court erred by extending the confidentiality protections of mediation to the settlement communication here. The parties agree we review the court's order for abuse of discretion. (See *Liberty Mutual Fire Ins. Co. v. LcL Administrators, Inc.* (2008) 163 Cal.App.4th 1093, 1102.) "The test on appeal is whether the trial court has abused the broad discretion to justify our interference with a sanction award. [Citations.] [¶] Where the issue on appeal is whether the trial court has abused its discretion, the showing necessary to reverse the trial court is insufficient if it presents facts which merely afford an opportunity for a different opinion: '*An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge*. To be entitled to relief on appeal from the

27

result of an alleged abuse of discretion it must clearly appear that the injury resulting from such a wrong is sufficiently grave to amount to a manifest miscarriage of justice; . . .' " (*Winick Corp. v. County Sanitation Dist. No. 2* (1986) 185 Cal.App.3d 1170, 1176; accord, *580 Folsom Assocs. v. Prometheus Dev. Co.* (1990) 223 Cal.App.3d 1, 20.)  The Charvats have not shown the trial court abused its discretion here.

"In order to encourage the candor necessary to a successful mediation, the Legislature has broadly provided for the confidentiality of things spoken or written in connection with a mediation proceeding." (*Cassel v. Superior Court* (2011) 51 Cal.4th 113, 117 (*Cassel*).)  "Mediation confidentiality is codified in Evidence Code section 1115 et seq.  This evidentiary restriction is not limited to those communications made ' "in the course of . . . mediation. [Citation.]" ' [Citation.]  Rather, as delineated in Evidence Code section 1119, the restriction applies to any written or oral communication made 'for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation,' as well as all 'communications, negotiations, or settlement discussions by and between participants in the course of a mediation or a mediation consultation . . . .' " (*Wimsatt v. Superior Court* (2007) 152 Cal.App.4th 137, 150-151 (*Wimsatt*).)

In order to determine whether a communication is protected by mediation confidentiality, "the timing, context, and content of the communication all must be considered.  Mediation confidentiality protects communications and writings if they are materially related to, and foster, the mediation.  [Citations.]  Mediation confidentiality is to be applied where the writing or statement would not have existed but for a mediation communication, negotiation, or settlement discussion." (*Wimsatt*, *supra*, 152 Cal.App.4th at p. 160.)

For purposes of mediation confidentiality, the statutes identify several conditions under which a mediation is considered to end. (Evid. Code, § 1125.) The conditions include where "[a] party provides the mediator and the other mediation participants with a writing stating that the mediation is terminated" and where "[f]or 10 calendar days, there is no communication between the mediator and any of the parties to the mediation relating to the dispute." (*Id.*, § 1125, subd. (a)(4)-(5).) But "[e]ven after mediation ends, communications and writings protected by the statutes are to remain confidential." (*Wimsatt*, *supra*, 152 Cal.App.4th at p. 152; see Evid. Code, § 1126.)

Our Supreme Court has "repeatedly said that these confidentiality provisions are clear and absolute. Except in rare circumstances, they must be strictly applied and do not permit judicially crafted exceptions or limitations, even where competing public policies may be affected." (*Cassel*, *supra*, 51 Cal.4th at p. 118.) The Supreme Court "has broadly applied the mediation confidentiality statutes and has severely curtailed courts' ability to formulate exceptions." (*Wimsatt*, *supra*, 152 Cal.App.4th at p. 152.)

The Charvats argue that the mediation had ended prior to trial, so the communication between the parties' attorneys just before trial was not protected by mediation confidentiality. But the trial court found that the settlement offer at issue had been exchanged during the mediation. The offer remained confidential after the mediation ended, and the trial court could reasonably find that the offer did not lose its confidentiality when it was raised in the attorneys' pretrial communication. The record supports the conclusion that the attorney for SDFH and Lincoln did not make a new settlement offer; he referred to the parties' prior confidential mediation communications. Unlike the authority cited by the Charvats, there is no

29

evidence he lowered the settlement demand or otherwise distinguished his offer. (Cf. *Wimsatt*, *supra*, 152 Cal.App.4th at p. 161.) The robust protections of the mediation confidentiality statutes would be undermined if merely referring to a mediation communication, after the mediation had ended, caused the communication to lose confidentiality. Such a result is inconsistent with the Supreme Court's direction that the statutes be broadly construed.

The Charvats argue that the court's order undermines the temporal limitations on mediation confidentiality, but we disagree. Settlement offers communicated during a mediation remain confidential even after the mediation ends. (Evid. Code, § 1126; *Wimsatt*, *supra*, 152 Cal.App.4th at p. 152.) The Charvats have not shown the trial court erred by finding that their attorneys' disclosure of the settlement offer violated the mediation confidentiality statutes.[7]

---

[7] Pursuant to Code of Civil Procedure section 2023.030, subdivision (a), "If a monetary sanction is authorized by any provision of this title, the court shall impose that sanction unless it finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust." (See also *id.*, § 2025.420, subd. (h).) The parties in their briefing have assumed that if disclosure was improper, the imposition of $1,600 sanctions here was within the bounds of the trial court's discretion. Accordingly, we express no opinion on that distinct issue.

DISPOSITION

The orders are affirmed.  SDFH and Lincoln are entitled to their costs on appeal.


GUERRERO, J.

WE CONCUR:



AARON, Acting P. J.



DATO, J.